THE UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  HONORABLE RICHARD K. EATON, SENIOR JUDGE

| | | |
|---|---|---|
| ALUMINUM EXTRUSIONS FAIR TRADE COMMITTEE, | ) ) ) ) | |
| Plaintiff | ) ) | **NON-CONFIDENTIAL** |
| v. | ) ) | Proprietary Information Removed From Pages 15, 19 to 20, 24 to 27, 31 to 33, and 37 |
| UNITED STATES, | ) ) | |
| Defendant, | ) ) | Court No. 22-00236 |
| and | ) ) | |
| KINGTOM ALUMINIO S.R.L., | ) ) | |
| Defendant-Intervenor. | ) ) | |

**RESPONSE BRIEF OF KINGTOM ALUMINIO S.R.L. IN SUPPORT
OF MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Brady W. Mills
Donald B. Cameron
Julie C. Mendoza
R. Will Planert
Mary S. Hodgins
Eugene Degnan
Jordan L. Fleischer
Nicholas C. Duffey

**MORRIS, MANNING & MARTIN LLP**
1401 Eye Street, N.W., Suite 600
Washington, D.C. 20005
(202) 216-4116

August 23, 2023                              *Counsel to Kingtom Aluminio S.R.L.*

**TABLE OF CONTENTS**

I.   STATEMENT PURSUANT TO RULE 56.2 ................................................................. 1

II.  ISSUES OF LAW PRESENTED ............................................................................... 2

III. STATEMENT OF FACTS ......................................................................................... 2

   A.  EAPA 7348 ......................................................................................................... 3

   B.  EAPA 7423 ......................................................................................................... 5

   C.  EAPA 7550 ......................................................................................................... 7

IV. SUMMARY OF ARGUMENT ................................................................................ 15

V.  STANDARD OF REVIEW ...................................................................................... 18

VI. ARGUMENT ........................................................................................................... 19

   A.  ORR Correctly Found That There Was No Substantial Evidence Of Evasion ................ 19

     1.  DGA Import/Export Information Affirmatively Proved No Evasion ........................... 19

     2.  AEFTC Fails To Identify Evidence Of Evasion ............................................ 21

     3.  Alleged Discrepancies Are Not Evidence Of Evasion ........................................ 23

   B.  ORR Correctly Determined That Adverse Inferences Were Not Appropriate ................ 34

   C.  ORR's Decision Is Consistent With Other EAPA Decisions ........................................... 41

VII. CONCLUSION ....................................................................................................... 43

CERTIFICATE OF COMPLIANCE ............................................................................. 44

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Altx, Inc. v. United States*,
167 F. Supp. 2d 1353 (Ct. Int'l Trade 2001) .........................................................23

*Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*,
222 F. Supp. 3d 1255 (Ct. Int'l Trade 2017) .........................................................23

*Changzhou Trina Solar Energy Co. v. United States*,
195 F. Supp. 3d 1334 (Ct. Int'l Trade 2016) .........................................................36

*Consol. Edison Co. v. NLRB*,
305 U.S. 197 (1938).................................................................................................21

*CS Wind Vietnam Co., v. United States*,
832 F.3d 1367 (Fed. Cir 2016).................................................................................23

*Global Aluminum Distributor LLC et al. v. United States*,
585 F. Supp. 3d 1352 (Ct. Int'l Trade 2022) ................................................. *passim*

*H&E Home et al. v. United States*,
Consol. Court No. 21-00337 (Ct. Int'l Trade Aug. 5, 2022) ..............................6, 42

*In re Gartside*,
203 F.3d 1305 (Fed. Cir. 2000).................................................................................18

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Automobile Ins. Co.*,
463 U.S. 29 (1983)...............................................................................................18, 22

*Nat'l Nail Corp. v. United States*,
390 F. Supp. 3d 1356 (Ct. Int'l Trade 2019) .........................................................36

*Nippon Steel Corp. v. United States*,
337 F.3d 1373 (Fed. Cir. 2003).................................................................................35

*NLRB v. Columbian Enameling & Stamping Co.*,
306 U.S. 292 (1939).................................................................................................21

*Pro-Team Coil Nail Enter. v. United States*,
419 F. Supp. 3d 1319 (Ct. Int'l Trade 2019) .........................................................36

*Royal Brush Mfg. v. United States*,
2023 U.S. App. LEXIS 19224 (Fed. Cir. July 27, 2023)..........................................27

*Wheatland Tube Co. v. United States*,
   161 F.3d 1365 (Fed. Cir. 1998)....................................................................................22

**Statutes**

19 U.S.C. § 1517(c)(1)(A) .........................................................................................21

19 U.S.C. § 1517(c)(3)(A) ....................................................................................34, 36

19 U.S.C. § 1517(c)(3)(C) .........................................................................................36

19 U.S.C. § 1517(f)(1) ...............................................................................................21

19 U.S.C. § 1517(g)(2)(A) .........................................................................................18

19 U.S.C. § 1517(g)(2)(B) .........................................................................................17

19 U.S.C. § 1677e(b)(1) .............................................................................................36

**Regulations**

19 C.F.R. § 165.6(a)...................................................................................................34

19 C.F.R. § 165.6(b)...................................................................................................36

**Other Authorities**

U.S. Customs and Border Protection Standards of Conduct, Directive No. 51735-
   013B (U.S. Customs and Border Protection Dec. 9, 2020) .....................................40

THE UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  HONORABLE RICHARD K. EATON, SENIOR JUDGE

| | | |
|---|---|---|
| _____ | ) | |
| ALUMINUM EXTRUSIONS FAIR TRADE COMMITTEE, | ) ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | **NON-CONFIDENTIAL** |
| v. | ) | Proprietary Information Removed |
| | ) | From Pages 15, 19 to 20, 24 to 27, |
| UNITED STATES, | ) | 31 to 33, and 37 |
| | ) | |
| Defendant, | ) | Court No. 22-00236 |
| | ) | |
| and | ) | |
| | ) | |
| KINGTOM ALUMINIO S.R.L., | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |
| _____ | ) | |

RESPONSE BRIEF OF KINGTOM ALUMINIO S.R.L. IN SUPPORT
OF MOTION FOR JUDGMENT ON THE AGENCY RECORD

Defendant-Intervenor Kingtom Aluminio S.R.L. ("Kingtom") files this brief in support of

its Rule 56.2 motion for judgment on the agency record and in response to the April 25, 2023

Rule 56.2 motion for judgment on the agency record filed by Plaintiff, the Aluminum Extrusion

Fair Trade Committee ("AEFTC"), ECF 33.  Kingtom respectfully requests that the Court

sustain the U.S. Customs and Border Protection's ("CBP") Final Determination.

I.      STATEMENT PURSUANT TO RULE 56.2

The administrative determinations before the Court are the Determination issued by

CBP's Office of Trade, Office of Regulation and Rulings ("ORR"), C.R. 89 (CBP's "Final

Determination"), and the Determination of CBP's Office of Trade, Trade Law Enforcement

Directorate ("TRLED"), C.R. 86 ("Initial Determination").  Plaintiff AEFTC only challenges

aspects of the Final Determination, and does not challenge any aspect of the Initial

1

Determination.  ECF 5 at 7; ECF 27.  Neither of CBP's Determinations were published in the Federal Register.

## II.    ISSUES OF LAW PRESENTED

1.    Whether ORR's finding that there was no substantial evidence of evasion is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law?

2.    Whether ORR not applying an adverse inference to Kingtom was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law?

## III.    STATEMENT OF FACTS

Kingtom was established in 2016 in a free trade zone in the Dominican Republic. C.R. 62 at 2.  From 2017 onward, Kingtom progressively ramped up its operations, producing more aluminum extrusions as more machines, personnel, and raw materials became available. *See id.* at 3.  Kingtom grew into one of the largest aluminum extrusion producers in the Gulf region, *id.* at 2, which, in turn, led to the filing of two EAPA cases by some of its competitors against importers of Kingtom products.  The first of these cases, EAPA Case No. 7348, was brought by Ta Chen International, Inc. ("Ta Chen"), the U.S. subsidiary of a Taiwanese aluminum distributor that competes with Kingtom.  *See* C.R. 1, Exhibit 2 at 2.  The second case, EAPA Case No. 7423, was brought by the Aluminum Extrusions Fair Trade Committee ("AEFTC"), also known as the Aluminum Extrusions Council ("AEC"), an ad hoc group of Kingtom's competitors.  C.R. 1 at 1 n.1, 20.  A third case that is the subject of this appeal, EAPA Case No. 7550, was brought by AEFTC against Kingtom as the importer of its own products. Although this appeal relates to the third EAPA case, EAPA 7550, a discussion of the earlier two EAPA cases is important to the Court's consideration of the Final Determination.

**A.  EAPA 7348**

In early 2019, Kingtom contacted Ta Chen about its relationships with aluminum raw

material suppliers in an effort to continue accumulating reliable sources of raw materials.  *See*

Remand Redetermination for Enforce and Protect Act Consolidated Case Number 7348 at 6*,*

*Global Aluminum Distributor LLC et al. v. United States,* 585 F. Supp. 3d 1352 (Ct. Int'l Trade

June 15, 2022) (Consol. Court No. 21-00198), ECF 93 ("7348 Remand Redetermination")*.*  Ta

Chen then conducted a site visit of Kingtom's facility, *see id.*, and subsequently filed an EAPA

case alleging that certain importers evaded the antidumping duty and countervailing duty

("AD/CVD") Orders on Aluminum Extrusions from the People's Republic of China by

importing aluminum extrusions from Kingtom.  *See id.*  On July 31, 2019, CBP also conducted a

site visit of Kingtom's facility for a DR-CAFTA verification.  *See* C.R. 87 at 2 (TRLED did not

place this site visit report onto the administrative record, but Kingtom knows the date of the

visit).  Thereafter, CBP initiated EAPA Consolidated Case No. 7348 against those importers.

*See* C.R. 1, Exhibit 2 at 4-5.

As part of its investigation, CBP sent a request for information ("RFI") to Kingtom who

timely responded.  C.R. 62.  Among other things, Kingtom explained the production capacity of

its equipment, provided daily extrusion production records for its extrusion machines, and listed

its suppliers and all the materials they provided.  *Id.*  CBP then issued a supplemental RFI to

Kingtom, to which it timely responded.  C.R. 63.  Kingtom reported its theoretical production

volumes based on the daily production records and its monthly export and local sales

information.  *Id.*

Thereafter, CBP issued its EAPA 7348 determination of evasion, finding that although

Kingtom was able to produce aluminum extrusions in the Dominican Republic, Kingtom's

failure to submit accurate information and cooperate to the best of its ability meant that CBP was

unable to determine that Kingtom actually did produce <u>all</u> of the aluminum extrusions it sold. *See* C.R. 6, Attachment 1 at 17.  Based on this finding, as well as the citizenship of Kingtom's management, CBP disregarded the information in Kingtom's submissions and instead found as an adverse inference that all merchandise entered into the United States by the named importers contained co-mingled Chinese- and Dominican Republic-origin aluminum extrusions.  *Id.* Following the filing of requests for administrative review, ORR affirmed TRLED's finding of evasion.  *See* 7348 Remand Redetermination at 2.  CBP's EAPA 7348 decisions were appealed to this Court in *Global Aluminum Distributor LLC et al. v. United States*, Consol. Court No. 21-00198.

Following the filing of initial Rule 56.2 briefs in that case, CBP requested and was granted a voluntary remand.  *See* Order, *Global Aluminum Distributor LLC v. United States*, 585 F. Supp. 3d 1352 (Ct. Int'l Trade April 15, 2022) (Consol. Court No. 21-198), ECF 91.  In that voluntary remand, ORR found that adverse inferences were not warranted, and that the record did not support a finding of evasion.  *See* 7348 Remand Redetermination.  More specifically, ORR found that the vast majority of alleged discrepancies had explanations on the record that TRLED did not examine, and TRLED failed to request any information about the other alleged discrepancies.  7348 Remand Redetermination at 3-4.  ORR also found that Kingtom and the 7348 importers complied with all requests for information and there was no indication that they did not cooperate to the best of their ability.  7348 Remand Redetermination at 4.  ORR re-examined Kingtom's ties to China and found that these ties did not support a finding that Kingtom did not produce the extrusions it sold to the United States.  7348 Remand Redetermination at 4.  ORR also compared the production information submitted by Kingtom to the government site visit reports on the record and found that the site visits reports did not

4

contradict the production information.  7348 Remand Redetermination at 4-6.  ORR also found

the reliability of Ta Chen's site visit report, a report written by a direct competitor, to be of

questionable reliability.  7348 Remand Redetermination at 6.  Based on this analysis, ORR

voluntarily reversed its initial decision and made a negative determination of evasion.  The Court

sustained the remand determination of no evasion and entered final judgment in *Global

Aluminum Distributor LLC et al. v. United States*, 585 F. Supp. 3d 1352 (Ct. Int'l Trade 2022).

### B.  EAPA 7423

On January 10, 2020, TRLED acknowledged receipt of a second allegation against

Kingtom, this time by AEFTC.  *See* C.R. 1, Exhibit 3 at 2.  AEFTC alleged that imports by

Global, Classic Metals Suppliers, Florida Aluminum Extrusion, LLC, H&E Home, Industrias

Feliciano Aluminum, Inc., JL Trading Corp. and Puertas y Ventanas (collectively the "7423

Importers") of aluminum extrusions Kingtom produced in the Dominican Republic were actually

produced in China and thus evading the antidumping and countervailing duty orders against

Aluminum Extrusions from the China.  *See* C.R. 1, Exhibit 3 at 1-2.  CBP initiated investigations

against the 7423 Importers on January 27, 2020.  *See* C.R. 1, Exhibit 3 at 1.

On May 4, 2020, TRLED issued a Notice of Initiation of Investigation and Interim

Measures and informed the 7423 Importers of the existence of the investigation.  C.R. 1 at

Exhibit 3.  On December 11, 2020, TRLED placed certain documents from EAPA 7348,

including the EAPA 7348 TRLED determination and Kingtom's RFI and Supplemental RFI

responses, onto the EAPA Case No. 7423 record.  C.R. 6, Attachment 2 at 4.  Following written

arguments and responses to written arguments, on January 28, 2021, TRLED made an

affirmative determination as to evasion, relying almost entirely on its analysis of EAPA 7348

documents.  C.R. 6 at Attachment 2.

On March 12, 2021, the 7423 Importers timely filed requests for review.  C.R. 70 at

Exhibit 96.  On June 4, 2021, having reviewed TRLED's January 28, 2021 determination of

evasion using a substantial evidence standard, rather than the *de novo* standard required by

statute, ORR affirmed TRLED's determination.  *See, e.g.*, Remand Redetermination at 3-4, 10,

*H&E Home et al. v. United States*, Consol. Court No. 21-00337 (Jan. 10, 2023), ECF 73 ("7423

Remand Redetermination").  The 7423 Importers appealed to the Court in *H&E Home et al. v.*

*United States*, Consol. Court No. 21-00337.

Following CBP's voluntary reversal in EAPA 7348, Defendant moved for voluntary

remand in *H&E Home.*  Defendant's Motion for Voluntary Remand, *H&E Home et al. v. United*

*States*, Consol. Court No. 21-00337 (Ct. Int'l Trade Aug. 5, 2022), ECF 65.  On remand, ORR

revisited and reweighed the evidence in light of the remand redetermination in EAPA 7348 and,

consistent with that redetermination, found no substantial evidence of evasion.  *See* 7423

Remand Redetermination.

ORR found that the record evidence showed that Kingtom in fact had the production

capacity to produce the quantity of extrusions that it exported to the United States.  In so

concluding, ORR acknowledged that Kingtom's own records show that it did not operate at full

capacity, but confirmed that its production capacity was more than sufficient to produce the

quantity of extrusions exported to the United States.  ORR observed that documents on the

record about Kingtom's production, sales, and operations, which needed analysis and

consideration to reach conclusions about Kingtom's capacity, were not analyzed by TRLED or

ORR in their original determinations.  *Id.* at 5.  Instead, those earlier determinations focused on

alleged discrepancies that had logical explanations that were erroneously disregarded and that

TRLED never followed-up on these alleged discrepancies.  *Id.*  ORR therefore found that it could not place great weight on these alleged discrepancies.  *Id.*

ORR further explained that the alleged discrepancies have logical explanations that ORR should have given more consideration during the administrative review process.  *Id.* at 10.  ORR also explained that absent a lack of cooperation that warrants the application of adverse inference, which was not present here, CBP cannot infer evasion from this record.  *Id.*  On that basis, "without deference to the TRLED January 28 Determination," ORR found that the record does not support a finding of evasion.  *Id.*

### C.  EAPA 7550

On October 5, 2020, AEFTC submitted another EAPA allegation against Kingtom, but this time with Kingtom as the named importer.  In its allegation, AEFTC claimed that Kingtom did not have the capacity or the capability to sell the extrusions it produces.  AEFTC's claims regarding capacity were based on a short-hand calculation using as "data" the assumptions made about Kingtom's capabilities following a few hours' long site visit one of its component members made to Kingtom's facilities in 2019.  *See* C.R. 1 at Exhibit 13.  Similarly, AEFTC's claims regarding Kingtom's extrusion capabilities were based on the maximum diameter extrusions AEFTC claimed were capable of being produced on the presses it saw present during the 2019 site visit.  Specifically, AEFTC, which presented one of its employees as an industry "expert," claimed that it was impossible to produce extrusions with a diameter greater than 1.5 inches smaller than the diameter of the extrusion press.  *Id.*  For example, AEFTC claimed that the maximum extrusion that could be produced on a 6-inch diameter press would be 4.5 inches wide.  *Id.*

On January 8, 2021, TRLED acknowledged receipt of AEFTC's allegation, and initiated EAPA Case No. 7550 against Kingtom as the importer on January 30, 2021.  C.R. 2.  The period

of investigation therefore began on January 8, 2020.  On May 10, 2021, TRLED notified

Kingtom of the existence of the investigation, and simultaneously ordered that all Kingtom

entries be entered as type 03 and subject to AD/CVD duties applicable to aluminum extrusions

from China.  C.R. 9.

On May 27, 2021, Kingtom requested pursuant to Sections 617 and 623 that CBP

compromise with Kingtom so that it could continue providing its merchandise to its U.S.

customers, some of which faced potential bankruptcy as a result of CBP's measures, while

providing other forms of security that would allow CBP to protect the revenue during the

pendency of the investigation.  *See* C.R. 11.  On June 2, 2021, TRLED refused to compromise,

and similarly refused to meet with Kingtom's counsel to discuss the effects of CBP's measures

on Kingtom's U.S. customers.  *See* P.R. 18.

On May 25, 2021, TRLED issued an RFI to Kingtom, to which Kingtom provided a full

and timely response.  C.R. 41.  In that response, Kingtom explained that it was in the process of

updating its systems in order to modernize its recordkeeping, and that this process would

continue during the investigation, which would necessarily require Kingtom to voluntarily

submit updated information in later submissions.  C.R. 41 at 1.  In its July 6, 2021 comments on

Kingtom's RFI response, AEFTC attacked this statement, claiming that "Kingtom's admission

that it has 'modernized' its records-keeping and accounting and production systems is

tantamount to an admission of evasion."  C.R. 43 at 3.  AEFTC did not and has not explained

how changing systems software and hiring outside accountants is evidence of transshipment.

On July 12, 2021, TRLED issued a supplemental RFI to Kingtom, to which Kingtom

provided a complete and timely response on August 2, 2021.  C.R. 54.  On August 4, 2021,

TRLED issued a second supplemental RFI to Kingtom, to which Kingtom provided a complete

and timely response on August 13, 2021.  C.R. 61.  On August 13, 2021, TRLED placed

Kingtom's RFI and supplemental RFI responses from EAPA Case No. 7348 onto the record of

this investigation, to which Kingtom provided timely responsive factual information on August

23, 2021.  C.R. 70.  In that submission, Kingtom again explained that submissions from the prior

investigations were made using outdated records, and that the information provided in

submissions on the record of the instant investigation, Case No. 7550, were the most accurate.

*Id*. at 3.

On August 17, August 18, and August 23, 2021 (the final day for the voluntary

submission of factual information), Kingtom timely filed voluntary submissions which included

updated versions of previous exhibits, updated to include data collected after the due date for the

previous submissions but within the period of investigation ("POI") and corrections to clerical

errors in the previously submitted data.  C.R. 65-68, 71-76.[1]  Kingtom also submitted zone-

specific import/export data from the Dominican government for all goods entering and leaving

the free trade zone in which Kingtom is located.  *See* Second Voluntary Submission at Exhibit

83; C.R. 71 at Exhibit 93.  Kingtom further requested in these submissions that CBP verify the

import/export data when it conducted an on-site verification.  Second Voluntary Submission at 2.

On August 23, 2021, AEFTC submitted an affidavit from one of AEFTC's members that

made suppositions about Kingtom's production capabilities, as well as "industry standard data"

---

[1] TRLED did not include Kingtom's Second Voluntary Submission, which contained the
Dominican Customs data submitted by Kingtom, in the administrative record filed with the
Court.  However, ORR references approvingly Kingtom's statement in its RFI response that
Kingtom did not import any aluminum extrusions from China into the Dominican Republic.  *See*
C.R. 89 at 10, n.27.  Kingtom thus believes that there is no dispute that the Dominican Customs
data shows that Kingtom did not import Chinese aluminum extrusions into the Dominican
Republic and that TRLED's omission of this data from the record before this Court does not and
should not impact the Court's review of AEFTC's challenge to ORR's Final Determination.

and "import subscription data" for which it did not provide public summaries.  P.R. 47.  Kingtom pointed out the deficient public summaries, after which CBP required AEFTC to refile its submission with further public summaries.  AEFTC's refiled submission contained the additional public summary which revealed that the "industry standard data" was not any sort of industry standard, but was instead a survey of AEFTC's component companies regarding their "press sizes and production data."  P.R. 49.

On September 2, 2021, Kingtom responded to AEFTC's claims, noting that one of AEFTC's members making claims about what Kingtom can or cannot produce is no more compelling than any of the other representations about Kingtom's production made by AEFTC throughout the investigation.  C.R. 78 at 2-4.  Kingtom further noted that representations of one of AEFTC's members is inseparable from implicit bias, and is likely to contain inaccuracies and claims that they potentially know to be false, and are inherently questionable and cannot be relied upon to draw any factual and unbiased conclusions.  *Id.*  Kingtom further provided evidence that a third-party aluminum extruder could also produce extrusions wider than the diameter of the extrusion press, as Kingtom also is able to do.  *Id.* at Exhibit 94.

On August 23, 2021, TRLED sent a verification engagement letter to Kingtom detailing what Kingtom needed to prepare in anticipation for CBP's August 30 through September 2, 2021 on-site verification.  C.R. 77.  Kingtom prepared these records to the best of its ability, despite the information in the engagement letter being requested under the assumption that Kingtom possessed a job-costing system.  As Kingtom does not, counsel for Kingtom contacted TRLED, and were informed that Kingtom should prepare documents consistent with its systems and recordkeeping.  *See* Email to Mary S. Hodgins from Scott Hoefke, TRLED, CBP, "Kingtom

verification prep question" (Aug. 27, 2021).[2]  As all of the selected invoices and work orders were during the POI, Kingtom prepared the related documentation in printed exhibits for CBP to review.

From August 30 to September 2, 2021, nine CBP officials and one translator conducted an on-site verification of Kingtom's facilities, frequently breaking into smaller groups that all separately and continuously requested information from Kingtom.  C.R. 81.

During verification, CBP officials also reviewed the documentation of Kingtom's retained independent accountant, who maintained financial records from before the POI and showed them to CBP upon request.  *Id.* at 9.  Kingtom also repeated its request that CBP verify the zone-specific import/export data provided by the Dominican government, and to speak with the Dominican government official located in the free trade zone who inspects all shipments entering and leaving the zone.  CBP declined to verify the records, but the import and export procedure, including import/export inspection, was explained to the CBP team, and the CBP team verified that this inspection was conducted by a Dominican government official.  *Id.* at 3.

CBP also verified Kingtom's production capabilities, including the fact that it is able to produce extrusions larger than the diameter of the press, contrary to AEFTC's representation that producing extrusions wider than 1.5 inches smaller than the diameter of the press was impossible.  *See id.* at 12.  CBP also toured Kingtom's facilities and witnessed each step of the production process, and picked out certain completed production orders that were awaiting other invoice items and verified that the produced goods were in fact packaged and awaiting shipment. *Id.* at 11-16.

---

[2] TRLED also did not include this email in the administrative record filed with the Court.

On September 10 and September 22, 2021, Kingtom filed the verification exhibits compiled by CBP, and on November 9, 2021, TRLED released its verification report, which detailed its version of events, and made numerous claims about what Kingtom officials had purportedly said during verification and about the events of the final afternoon and evening of verification. *Id.* Notably, TRLED's verification report confirmed CBP's verification of Kingtom's ability to produce extrusions wider than the diameter of the extrusion press. *See id.* at 12.

On November 12, 2021, Kingtom submitted a response to TRLED's verification report, questioning the authenticity of CBP's recounting of statements allegedly made by Kingtom officials at verification and the behavior of counsel.  In particular Kingtom requested that such hearsay be stricken from the report, as it was not factual.  However, on November 15, 2021, TRLED rejected Kingtom's November 12, 2021 submission as it was "unsolicited" and purportedly contained "new factual information that was not in the verification report nor previously submitted on the record."  P.R. 61.

On November 29, 2021, Kingtom submitted its written arguments, arguing at the forefront that the Dominican customs data it submitted, which demonstrated that Kingtom had not imported any aluminum extrusions from China into the free trade zone where it is located in the Dominican Republic, categorically dispelled the possibility of transshipment, and that any evasion finding would not be supported by substantial evidence.  C.R. 83.[3]  Kingtom also argued that AEFTC failed to identify any substantial evidence of evasion, and instead made misleading or false statements about what could be produced using Kingtom's machinery, that there were no discrepancies on the record that would warrant disregarding record evidence, that TRLED could

---

[3] *See supra* note 1.

not rely on its findings in the previous EAPA cases to disregard such record evidence in this case, and that TRLED should strike the hearsay from its verification report.  *Id.*

AEFTC also submitted its written arguments on November 29, 2021, arguing that Kingtom could not produce enough or the type of extrusions it sold using its machinery, and that TRLED should apply adverse facts available to Kingtom.  C.R. 82.  Kingtom responded on December 14, 2021, pointing out that AEFTC's claims are conjectural, conclusory, and not grounded in fact, and that Kingtom cooperated to the best of its ability.  C.R. 85.  AEFTC also responded on December 14, 2021, reiterating its arguments, but backpedaling its argument concerning extrusion width capabilities, instead stating that Kingtom utilizing presses in such a manner is merely impractical.  *See* C.R. 84.

On February 4, 2022, TRLED released its determination as to evasion, finding through the application of adverse inferences that Kingtom evaded the AD/CVD orders on aluminum extrusions from China.  *See* C.R. 86.  Specifically, TRLED applied adverse inferences to Kingtom on the grounds that:  (1) Kingtom did not provide accurate information; (2) Kingtom did not provide certain source documents at verification; (3) Kingtom destroyed pre-January 2020 records that were relevant to this proceeding; and (4) Kingtom officials obstructed verification by intimidating their workers.

On March 21, 2022, Kingtom timely filed a request for administrative review with ORR, which after a delay in receipt and its resubmission at ORR's direction, C.R. 87, was accepted on April 5, 2022.  P.R. 75.  Kingtom argued that TRLED ignored the vast majority of evidence on the record in favor of TRLED's manufactured basis for the application of adverse inferences. This evidence included import and export data into the free trade zone in which Kingtom is located, which demonstrated that it did not import any aluminum extrusions from China and thus

disproved the possibility of transshipment of Chinese extrusions.  It also included comprehensive production and sales information, technical specifications for Kingtom's manufacturing equipment, and Kingtom's supply records, proving that Kingtom had more than sufficient capacity to produce the quantity of extrusions it sold to the United States.  Kingtom also directed ORR to its explanations for alleged discrepancies at verification, which were entirely ignored by TRLED in its Initial Determination.  Kingtom also challenged TRLED's characterization of what occurred during verification, including alleged deletion of records and workers issues, arguing that these characterizations are unsupported by record evidence and are otherwise irrelevant to the question of evasion, and do not support the application of adverse inferences.

AEFTC responded on April 19, 2022, arguing that because the Dominican customs data does not account for activities outside the free trade zone area and only extends back to January 2019, it does not prove a lack of transshipment.  *See* C.R. 88.  AEFTC further argued that alleged discrepancies noted by TRLED in its verification report and the citizenship of Kingtom's management were affirmative evidence of evasion.  *Id.*  Finally, AEFTC argued that the application of adverse inferences to Kingtom was proper because Kingtom "failed" verification, and because of alleged discrepancies identified in Kingtom's 7348 RFI responses and TRLED's characterization of events at verification.

On June 29, 2022, ORR released its Final Determination, reversing TRLED's Initial Determination and finding that the record does not contain substantial evidence of evasion. *See* C.R. 89.  ORR considered the arguments presented by the parties, as well as the arguments presented to TRLED in the parties' written arguments, finding that TRLED erroneously disregarded record evidence in favor of its unsupported application of adverse inferences.  ORR found based on its *de novo* review that substantial evidence demonstrates that Kingtom had the

capacity to produce and did produce the aluminum extrusions it exported to the United States. *Id.* at 8. This conclusion was supported by TRLED's observations of Kingtom's production capacity and sizing capabilities at verification, which were themselves supported by Kingtom's production and sales figures. *Id.* at 9. ORR noted the lack of record evidence of imports by Kingtom into the Dominican Republic of aluminum extrusions from China during the POI, reasoning that this supports its conclusion of a lack of transshipment. *Id.* at 10. ORR further analyzed raw material supplier information, which confirms that only minor materials, such as

[                                                        ] were sourced from China. *Id.* at 10-11. ORR also considered Kingtom's ties to China, but noted that this is not evidence of evasion, especially in the face of documented and observed significant manufacturing in the Dominican Republic. *Id.* at 11.

Finally, ORR considered the characterizations of events at verification, noting that sales from inventory, even if contradictory, are not substantial evidence of evasion. *Id.* at 11 n.33. ORR also considered TRLED's characterization of the workers issue and found that in the absence of evidence that the presence of workers was fictitious or any assertion that the workers falsified or withheld information, the workers concerns do not have sufficient bearing on production capability and actual production, the determinative factors in this case. *Id.* at 11. As those factors overwhelmingly pointed to significant production in the Dominican Republic, ORR reversed TRLED's finding and found no evasion.

## IV.    <u>SUMMARY OF ARGUMENT</u>

At its core, AEFTC's entire argument is that TRLED was right and ORR was wrong, pointing to TRLED's Initial Determination as support. But it is clear from TRLED's conduct of the investigation that it sought any available basis to demonstrate the correctness of its previous two EAPA decisions against Kingtom, and that when confronted with a record that demonstrated

that all the aluminum extrusions that were exported by Kingtom to the United States during the POI were produced in the Dominican Republic, TRLED applied adverse inferences rather than admit that its previous determinations were incorrect.  TRLED thereby ignored all arguments and evidence to the contrary, including Kingtom's specific deconstruction of each of TRLED's inaccurate claims and its submission of complete import and export data provided by the Dominican Government that showed that Kingtom did not import any Chinese aluminum extrusions and thus affirmatively disproved TRLED's theory of evasion.

Unlike TRLED, ORR conducted a full review of the record and impartially considered Kingtom's arguments and submissions, finding them credible and supported.  ORR observed that Kingtom had more than sufficient capacity to produce and in fact did produce enough aluminum extrusions at its production facility in the Dominican Republic to cover what it actually exported to the United States during the POI.  ORR also noted that the record did not contain any instances of Kingtom withholding requested information, and that the record instead demonstrates Kingtom's active participation and willingness to provide information voluntarily. ORR therefore found the application of adverse inferences unjustified and reversed TRLED's finding of evasion.  This decision not to apply adverse inferences was a reasonable exercise of discretion by ORR as part of its *de novo* review.

Now, on appeal, AEFTC relies on its own self-serving allegations along with reversed EAPA decisions in prior EAPA investigations where Kingtom was not even a party, and fills in any gaps with conjecture, hyperbole, or misleading or plainly inaccurate statements.  This does not suffice under the standard of review.  AEFTC must demonstrate that ORR's Final Determination was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  Yet, AEFTC neither acknowledges nor disputes the Dominican Customs import data

that shows that Kingtom did not import any aluminum extrusions from China during the POI, or even the year prior. Perhaps recognizing the devastating impact of this Dominican Customs data on its evasion determination, TRLED failed to even include it as part of the administrative record filed with this Court — despite it being timely submitted during the underlying investigation.

Unable to present a colorable case of evasion using the actual record evidence in this case, AEFTC resorts to claims that alleged "discrepancies" identified by TRLED constitute substantial evidence of evasion. But these "discrepancies" are mischaracterizations by TRLED for which Kingtom already provided an explanation that was duly considered by ORR or are not relevant to the POI of this case. Moreover, even if these "discrepancies" were not fictitious, they would not justify a finding of evasion under a substantial evidence standard, let alone require the reversal of a finding of no evasion under the narrow arbitrary and capricious standard of review.

AEFTC also points to TRLED's mischaracterization of events at verification as supporting the application of adverse inferences. But as ORR correctly notes, even TRLED's characterization does not indicate or assert that information pertinent to the question of evasion was withheld. AEFTC speculates how theoretical withheld information, if supplied, could have impacted TRLED's consideration of record evidence, but these post-hoc rationalizations are unsupported by record evidence and do not undermine ORR's conclusion that TRLED failed to identify any legal or factual basis to apply adverse inferences.

Finally, AEFTC's contention that the Final Determination is inconsistent with CBP's decisions in the two prior EAPA cases involving Kingtom is wrong. This Court has sustained a negative evasion finding in the first and is currently reviewing a negative evasion finding in the second. Far from supporting AEFTC's arguments, these prior two EAPA decisions cement the conclusion that there is no basis for any evasion finding in this case because they are all bound

17

up in the same basic set of operative facts.  In light of these decisions, Kingtom requests that the Court sustain CBP's Final Determination.

## V.    <u>STANDARD OF REVIEW</u>

The Court reviews CBP's determinations, factual findings, and legal conclusions using an arbitrary and capricious standard.  19 U.S.C. § 1517(g)(2)(B) ("{T}he United States Court of International Trade shall examine—whether any determination, finding, or conclusion is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.").  Under the arbitrary and capricious standard, the scope of review is narrow, and the reviewing court may not substitute its judgment for that of the agency.  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983).  Instead, the Court reviews whether the agency has examined the relevant data and articulated a satisfactory explanation for its action, including a "rational connection between the facts found and the choice made."  *Id.* (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).  While the Court "may not supply a reasoned basis for the agency's action that the agency itself has not given," *id.* (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)), the Court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."  *Id.* (quoting *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 286 (1974)).  Meanwhile, an "abuse of discretion occurs when a decision is based on an erroneous interpretation of law or clearly erroneous factfinding, or if that 'decision represents an unreasonable judgment in weighing relevant factors.'"  *In re Gartside*, 203 F.3d 1305, 1315-16 (Fed. Cir. 2000) (quoting *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1039 (Fed. Cir. 1992)).

The Court also examines whether CBP fully complied with the procedures set forth in the statutory provisions covering EAPA investigations and reviews.  19 U.S.C. § 1517(g)(2)(A).

NON-CONFIDENTIAL

## VI.   ARGUMENT

### A.  ORR Correctly Found That There Was No Substantial Evidence Of Evasion

The threshold issue that ORR needed to address is whether there was substantial evidence demonstrating that Kingtom made a material and false statement or material omission by entering Chinese-origin aluminum extrusions that were declared as Dominican-origin.  ORR correctly recognized that no such evidence exists — to the contrary, Dominican Customs data on the record, provided by the Dominican Customs authority, Dirección General de Aduanas ("DGA"), demonstrated conclusively that Kingtom did not import any aluminum extrusions from China and thus could not have evaded the antidumping and countervailing duty orders on Chinese aluminum extrusions via transshipment from the Dominican Republic.[4]  On appeal, AEFTC does not address this unrebutted and conclusive evidence,[5] which demonstrated that Kingtom did not transship Chinese origin aluminum extrusions to the United States or otherwise commingle Chinese origin aluminum extrusions with DR-produced extrusions during the POI.

### 1.  DGA Import/Export Information Affirmatively Proved No Evasion

Kingtom is located in a free trade zone, which subjects it to strict rules about its imports and exports.  C.R. 83 at 3 (citing Second Voluntary Submission at 2).  Each incoming container is inspected and the contents are confirmed by agents of DGA.  C.R. 81 at 3.  The Dominican Government specifically [

---

[4] As noted above, perhaps recognizing the devastating effect this data would have on its Initial Determination, TRLED did not file the submission containing the DGA import data, Kingtom's Second Voluntary Submission, dated August 18, 2021, with the Court.  TRLED nonetheless certified that it prepared and delivered to the Court a "true and complete copy of the administrative record in the above-referenced proceeding."  ECF 20-1, 21-2.

[5] Conversely, AEFTC did acknowledge this evidence in its response to Kingtom's request for review, arguing against the strength of the evidence on ORR's review determination.  C.R. 88 at 8-11.  ORR did not, however, need to reach this issue.  C.R. 89 at 11.

**NON-CONFIDENTIAL**

]. C.R. 70 at 2, Exhibit 95.  DGA enforces the rules of the free trade zone by inspecting *every* import into and export out of Kingtom's facility.  C.R. 83 at 3 (citing Second Voluntary Submission at 2).

In its Second Voluntary Submission, Kingtom provided a complete list of its imports into the free trade zone from which it operates during the period from January 2019 to June 2021. C.R. 83 at 4 (citing Second Voluntary Submission).  DGA itself provided the data and certified its accuracy.  C.R. 83 at 4 n.6 (citing Second Voluntary Submission at Exhibit 84).  The data shows that during the relevant period, Kingtom imported no aluminum extrusions from China or, in fact, any alloyed aluminum extrusions from any other country.  C.R. 83 at 4 n.7 (citing Second Voluntary Submission at 3-4, Exhibit 84).  Kingtom requested that TRLED verify this DGA import data, C.R. 83 at 4 n.8 (citing Second Voluntary Submission at 2), but TRLED declined to do so.  *See* C.R. 81.  Nevertheless, TRLED did verify the import procedures, and noted in its verification report that "DR Customs examines every truck and container arriving into Kingtom's facility."  *See* C.R. 81 at 3.

It is accordingly impossible for Kingtom to have commingled or otherwise exported in-scope Chinese extrusions to the United States because it never imported Chinese extrusions into the free trade zone where it is located.  The Dominican Government certified this fact.  This evidence demonstrated that there is no factual basis to support an affirmative evasion determination.  While ORR did not need to rely on this evidence when reversing TRLED's finding of evasion, C.R. 89 at 11 ("{T}here is not substantial evidence to support a finding of evasion as to Kingtom.  As a result, we do not find it necessary to address the remaining arguments made by Kingtom in its Request for Administrative Review"), it remains evidence of such weight that it would preclude a finding of evasion.

Accordingly, no reasonable fact finder could have concluded that Kingtom is transshipping aluminum extrusions from China and claiming that they are produced by Kingtom in the Dominican Republic.

### 2.   AEFTC Fails To Identify Evidence Of Evasion

In the review, ORR recognized that TRLED based its determination entirely on its application of adverse facts available, and that absent such an inference, the record does not contain *any* evidence of evasion.  C.R. 89 at 7-9.  Rather than identifying any affirmative evidence of evasion to challenge ORR's Final Determination, AEFTC argues that ORR's Final Determination is arbitrary and capricious simply because it is different from TRLED's Initial Determination.  ECF 33 at 21-22.  But AEFTC's argument relies on the assumption that ORR's standard of review is in some manner deferential to TRLED.  AEFTC is incorrect — ORR did not owe any deference to TRLED's determination when conducting its *de novo* review. Applying the correct *de novo* standard of review to reach a different conclusion does not require a comprehensive analysis of every discrepancy alleged by TRLED.  Instead, it amounts to ORR applying anew the substantial evidence standard as per statutory requirements and reaching its own conclusions based on a review of the entire record.  19 U.S.C. § 1517(f)(1) (providing for *de novo* review of TRLED decision); 19 U.S.C. § 1517(c)(1)(A) (providing for substantial evidence standard for evasion determination).

Unlike the "reasonably suggests" standard for initiation, findings of substantial evidence for determinations must be supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).  Substantial evidence "must do more than create a suspicion of the existence of the fact to be established."  *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292,

300 (1939).  For EAPA determinations, a finding of evasion requires substantial evidence that

"covered merchandise entered into the customs territory of the United States through evasion."

19 U.S.C. § 1517(c)(1)(A).  Absent actual evidence, rather than speculation or conjecture, that

covered merchandise entered the United States through evasion, CBP cannot make an

affirmative evasion determination.  In other words, CBP has to support any evasion

determination with substantial evidence of evasion.  The statute does not provide for a "guilty

until proven innocent" standard such that once a bare bones allegation is made, the burden shifts

to the investigated party to provide substantial evidence that it did not evade.

When viewed under the proper standard of review, it is plain that ORR's Final

Determination of no evasion was not arbitrary, capricious, or an abuse of discretion.  To

determine whether an agency decision is arbitrary, capricious, or an abuse of discretion the Court

"look{s} for a reasoned analysis or explanation for {the} decision."  *Wheatland Tube Co. v.*

*United States*, 161 F.3d 1365, 1369 (Fed. Cir. 1998).  "The scope of review under the 'arbitrary

and capricious' standard is narrow and a court is not to substitute its judgment for that of the

agency."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

In conducting its *de novo* review to determine if there was substantial evidence of

evasion, ORR considered the record as a whole.  Following that analysis, ORR determined that

the information and explanations provided by Kingtom are sufficiently credible and reliable and

are consistent with on-site observations made at verification.  In the absence of evidence to the

contrary and the non-application of adverse inferences, ORR found that the record does not

contain substantial evidence of evasion, and therefore made a negative evasion finding.  C.R. 89

at 8-11.  ORR's decision is reasonable and AEFTC's mere disagreement with it is not a

sufficient basis to disturb it under this narrow standard of review.

### 3.   Alleged Discrepancies Are Not Evidence Of Evasion

As explained by Kingtom during the investigation and review, all of the "discrepancies" identified by AEFTC are either irrelevant or not actual discrepancies.  ORR consideration of Kingtom's explanations was not only reasonable, but was required.

In contrast, TRLED's Initial Determination was not supported by substantial evidence — TRLED ignored significant portions of the administrative record, made numerous unfounded and unsupported claims, and did not even attempt to address most of Kingtom's written arguments. Under a substantial evidence standard, TRLED was required to take into account evidence that contradicted or undermined its decision.  *CS Wind Vietnam Co., v. United States*, 832 F.3d 1367, 1373 (Fed. Cir 2016) ("{T}he substantiality of evidence must take into account whatever in the record fairly detracts from its weight.").  TRLED was also required to "address significant arguments and evidence which seriously undermine{d} its reasoning and conclusions." *Altx, Inc. v. United States*, 167 F. Supp. 2d 1353, 1374 (Ct. Int'l Trade 2001)); *see also Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 222 F. Supp. 3d 1255, 1269 (Ct. Int'l Trade 2017).  TRLED's failure to account for contradictory evidence and to address significant arguments that seriously undermined its conclusion rendered its Initial Determination unsupported by substantial evidence.  This was one of the many factors ORR considered when coming to a different conclusion.

AEFTC claims that ORR should have nonetheless addressed arguments that TRLED failed to address in the Initial Determination.  For example, AEFTC claims that ORR should have discussed alleged discrepancies between the amount shipped and the amount produced for certain work orders detailed in TRLED's verification report and repeated in the Initial Determination.  ECF 33 at 22.  But Kingtom fully responded to the verification report's allegation that certain "variances" in Kingtom's production system evidence that "more units

were shipped and invoiced than were produced," C.R. 81 at 7-9, in its written arguments before

TRLED.  *See* C.R. 83 at 31-33.  As Kingtom explained at length therein, at verification, Kingtom

demonstrated that **[**

                                                                                                        **]**:

**[**



                                                        **]**. { *See* C.R. 80, Verification Exhibit 4 at 10. } **[**

                                                        **]**. { *See id.* at 14-16. } **[**
                                                                        **]**. { *See id.* at 14-16. }
**[**

                                                                        **]**. { *See id.* at 17-

19. } **[**



                                        **]** . . .

As is widely known and standardized in the base metals industry, there is a quantity
tolerance for all orders.  Accordingly, factory operators will often produce more than the
quantity ordered in order to control for unforeseen variables, such as damage or failing
quality assurance checks. { *See* C.R. 81 at 12. } Like other producers in base metals,
Kingtom also follows this practice. . . .  However, **[**

                                                **]**.

**[**

        **]**. . . . **[**



                                                **]**. { *See* C.R. 80, Verification Exhibit 4 at 27-

29. } . . . **[**



        **]**.

*See* C.R. 83 at 31-33.  That TRLED failed to consider this and other explanations, *see* C.R. 87 at

17 (citing C.R. 83 at 31-33), in its Initial Determination was noted in Kingtom's request for

review.  *See* C.R. 87 at 24 & n.119 ("Because TRLED did not address these explanations,

**NON-CONFIDENTIAL**

Kingtom will not repeat them here. . . .  Kingtom incorporates its written arguments by reference.").  ORR observed that TRLED "discounted most, if not all, all of the documentation and explanations provided by Kingtom," C.R. 89 at 8, and recognized that "{m}ost of the alleged discrepancies" were "thoroughly explained by Kingtom at pages 23 through 30 of its Request for Administrative Review."  C.R. 89 at 11 n.34.

    AEFTC also claims that Kingtom's production records list extrusion machines that Kingtom reported as having [                                    ] production records, pointing to the Initial Determination in support.  ECF 33 at 23 (citing C.R. 86 at 12-13).  However, AEFTC acknowledges that "the production records are from dates prior to the POI of the underlying investigation."  *Id.*  They are, therefore, not relevant to the instant case.  Even if they were, a review of the Initial Determination reveals that TRLED referred to the [

                                    ] *See* C.R. 86 at 12.  That

[                                                                              ]

is not a discrepancy, even if it were during the POI.

    AEFTC also continues to claim that Kingtom cannot have produced aluminum extrusions in the necessary sizes to fill its orders to the United States because its largest extrusion machine in 8-inches in diameter.  ECF 33 at 23-24.  This claim is based on the attestation of representatives of AEFTC's component companies (which it calls "experts") that "the size of the aluminum profile on any given press is normally 1.5 inches less than the size of the press diameter."  ECF 33 at 23 (citing C.R. 1 at Exhibit 12 p. 3).  AEFTC therefore claims that for Kingtom to produce a 7-inch profile sold [                            ] "a 9-inch press or larger would be needed."  ECF 33 at 24 (citing C.R. 1 at Exhibit 12 p. 5).  This is blatantly false.

NON-CONFIDENTIAL

The fact that aluminum extrusion producers produce extrusions larger than their press machines is common knowledge in the industry.  Notably, Benada Aluminum Products, LLC, another aluminum extrusion producer that is not associated with the AEFTC companies, states on its website that it can "produce up to 12-inch wide extrusions" using its presses that range from 6 inch to 8 inch.  C.R. 78 at Exhibit 94.  Similarly, as shown at Exhibit 29 of its Initial RFI Response, Kingtom can extrude profiles up to [                    ] using its extrusion machines (using its [                    ]).  The largest die Kingtom actually utilized during the POI, however, had a diagonal cross-section of [              ], consistent with the capabilities of other aluminum extruders.  *See* C.R. 54 at Exhibit 66 and Exhibit 67 (die [              ]).

At verification, TRLED verified the dimensions of Kingtom's extrusion machines and observed the production of extrusions using nine different dies, including [      ] that produced extrusions [        ] than the diameter of Kingtom's [        ] extrusion press, and noted no discrepancies with Kingtom's reporting.  C.R. 81 at 12 ("Kingtom was able to adequately demonstrate their ability to extrude the selected molds and produced them as per schematic specifications.").  TRLED thus observed in-person that AEFTC's representations regarding the maximum diameter that Kingtom's presses could produce were either grossly uninformed or deliberately misleading.  It was not the responsibility of ORR to address the false claims that even TRLED did not entertain.

AEFTC continues by claiming that Kingtom's employee records contained "discrepancies" because TRLED did not review paper attendance records that Kingtom did not retain after entering the information into Excel.  ECF 33 at 24.  AEFTC does not, however, explain what makes this a "discrepancy."  AEFTC does not point to any part of the record in

NON-CONFIDENTIAL

which Kingtom claimed it retains attendance records after putting them into Excel, nor does AEFTC identify any requirement for the retention of paper attendance records after the information is electronically recorded.

AEFTC continues by perpetuating TRLED's claim that Kingtom deleted pre-2020 records, including pre-2020 Excel attendance records.  As an initial matter, as discussed above, pre-2020 information is not relevant to the instant case as the POI began in January 2020.  Significantly, however, even TRLED's verification report does not claim that Kingtom deleted pre-2020 attendance records.  Instead, it simply notes that **[                              ]** from Kingtom's human resources department only had 2020 and 2021 records on **[      ]** shared drive.  C.R. 81 at 16.  The verification report does not say that TRLED requested to view pre-2020 attendance information because it did not.  Indeed, as Kingtom explained in its response to TRLED's verification report, Kingtom expressly offered pre-2020 employee attendance and payroll records to TRLED during verification, but TRLED declined to view such records as they were not necessary.  *See* Response to Verification Report (removed from the record by TRLED in P.R. 61).[6]  TRLED verifying records covering the entire POI that are consistent with Kingtom's submissions is not a discrepancy.

AEFTC also claims that Kingtom did not have a night shift in January 2020, which it says is inconsistent with Kingtom's statement that there are two 12-hour shifts each day.  This claim, which is a simple perpetuation of TRLED's unfounded claim in its Initial Determination, is inconsistent with record evidence and the verification exhibits.  As an initial matter, the

---

[6] As the Federal Circuit recently held, TRLED rejecting an importer's comments in response to a verification report is a violation of due process. *Royal Brush Mfg. v. United States*, 2023 U.S. App. LEXIS 19224 at *21-23 (Fed. Cir. July 27, 2023).  TRLED's rejection of Kingtom's response to its verification report during the investigation was therefore a violation of Kingtom's right to due process.

blanket statement that Kingtom runs two shifts per day does not necessarily mean that Kingtom *always* runs two shifts per day—that there may not have been night-time production in a particular month does not mean that Kingtom does not run two shifts per day.  In fact, Verification Exhibit 16 demonstrated hours and salaries "de noche" for several months.  For example, page 53 of Verification Exhibit 16 is labeled "Extrusion Workshop Night Shift Workers."  *See* C.R. 80 at Exhibit 16.  The verification exhibits support that Kingtom operates two shifts per day, even if it is at least some of the time or for only certain workshops, and it is not contradictory for Kingtom to report that it does so even if a specific workshop does not have night-workers attend for a particular month.  More significantly, Kingtom's RFI response from EAPA Case No. 7348 indicates that Kingtom did run two shifts per day during January 2020, including a night shift, for some workshops but not others.  C.R. 62 at Exhibit 14 (Kingtom 7348 RFI Response).  It was therefore unclear what TRLED meant by its statement that Kingtom did not, and TRLED does not specify the workshop of the attendance sheet it allegedly viewed. Notably, however, TRLED chose not to include any January 2020 attendance sheets it viewed in the verification exhibits.  *See* C.R. 80 at Exhibit 16 (containing attendance sheets from February 2020 onward).

AEFTC further claims that because some group leaders do not require their groups to sign for their pay, that Kingtom's vice president telling TRLED that workers are supposed to sign for their pay is a discrepancy.  Even if this were the case, Kingtom's vice president is upper management and does not handle day-to-day employee management—his communications of general company policy regarding pay distribution to TRLED is not necessarily reflective of how factory floor managers handle pay distribution in practice.  Regardless, whether group leaders

consistently require signatures from their employees when distributing their pay is not relevant to the transshipment scheme alleged by AEFTC.

Regarding AEFTC's claims regarding facial recognition, TRLED unilaterally chose to end verification in the early evening on the last day of verification rather than verify the last pending item: TRLED's review of the facial recognition system. TRLED ending verification rather than verify the facial recognition system is not a discrepancy, but a failure by TRLED to review all of the evidence being offered to them.

AEFTC also claims that ORR should have acknowledged alleged discrepancies in the list of EAPA 7348 suppliers that TRLED placed onto the record. Specifically, AEFTC appears to claim that Kingtom's alleged failure to provide more specific information in its EAPA 7348 responses should somehow be imputed here as a failure to cooperate in EAPA 7550. As above, any alleged discrepancies identified in supplier lists that pre-date the POI were irrelevant to the EAPA 7550 investigation and review. Moreover, the question of Kingtom's cooperation or non-cooperation in EAPA 7348 is settled—CBP found that Kingtom did in fact cooperate to the best of its ability in that case, and that determination has been sustained by this Court and entered as final judgment. *Global Aluminum Distributor LLC et al. v. United States*, Consol. Court No. 21-00198 (Ct. Int'l Trade Aug. 8, 2022).

AEFTC also claims that because bulk transfers to a Chinese supplier of raw materials that also holds wages for Chinese employees for their retrieval when they return home to China were not reconciled through the time of TRLED's visit is a discrepancy. However, far from this being a discrepancy, this was fully explained to TRLED in Kingtom's First Supplemental RFI Response:

> As noted above, Kingtom reconciles certain records to Kingtom's financial accounting records on a rolling basis. In this case, the payroll records for May and June 2021 are still

> being reconciled to "salary" in Kingtom's financial accounting records. In the ordinary
> course, Kingtom does not consider reports finalized until the reconciliation is complete.
> Accordingly, these reports are only finalized through April 2021.

C.R. 54 at 6. Thus, as of the time of Kingtom's August 2, 2023 Supplemental RFI, Kingtom had

only reconciled these records through April 2021. A review of Verification Exhibit 5, which

TRLED relied upon when claiming an alleged discrepancy discovered during its August 30 to

September 2, 2023 visit, reveals that such records were also reconciled through April 2021.

Kingtom's records reflecting its prior explanation of the status of its records is not a discrepancy,

but instead shows that Kingtom fully disclosed such information prior to TRLED's visit.

AEFTC also claims that alleged discrepancies in Kingtom's financial records resulted in

TRLED being unable to verify the accuracy of Kingtom's financial statements. ECF 33 at 28-

29. However, on further review this also involves reliance on TRLED's review of

documentation that was submitted in EAPA 7348 and pre-dates the POI. As Kingtom repeatedly

explained to TRLED, it has improved its recordkeeping and accounting since the prior EAPA

investigations in a good faith effort to comply with CBP requirements and U.S. law. *See* C.R. 41

at 1. Therefore, "to the extent information that Kingtom provided in this investigation is

inconsistent with information provided in other EAPA proceedings, the information that

Kingtom provided in this investigation supersedes and replaces prior information as the

information provided in this investigation is more accurate." See C.R. 70 at 3. As verified,

Kingtom hired an external accountant to handle its in-house accounting. *See* C.R. 81 at 9. The

2019 financial information provided in the EAPA 7550 investigation more accurately reflected

Kingtom's accounting and financial information than information provided in EAPA Case No.

7348. Moreover, the 2019 financial information that Kingtom submitted in the EAPA

investigation at issue ties directly to Verification Exhibit 4, as Kingtom demonstrated in its

written arguments. *See* C.R. 83 at 36. The verification report even stated that CBP verified

Kingtom's 2019 financial data and "did not note any differences between the unaudited Income

Statement and the Statement of Financial Position provided in verification Exhibit 4 and initial

RFI Exhibit 7 for the year ended December 31, 2019."  C.R. 81 at 10.

AEFTC further claims that TRLED could not verify Kingtom's bank information because

Kingtom did not provide original source documents for those banks at verification.  As Kingtom

explained in its written arguments and as is clear from a review of the verification exhibits, this

is plainly incorrect.  At verification, Kingtom provided bank statements for the sample work

orders for which TRLED requested proof of payment.  C.R. 80 at Exhibits 6-15.  These bank

statements are from the very bank account that Kingtom closed, **[                                                ]**.

*See id.*  The payments in the work orders reconcile directly to the bank account statements that

Kingtom reported to TRLED in its initial RFI, *compare id.*, *with* C.R. 41 at Exhibit 11, and even

to the statements that Kingtom provided in EAPA Case No. 7348.  *Compare* C.R 62 at Exhibit

10 Attachment B, *with* C.R. 80 at Exhibit 6.  Indeed, AEFTC points to no bank information that

TRLED *actually requested* which Kingtom was unable to provide.  *See* ECF 33 at 28-29.

The final alleged discrepancy claimed by AEFTC concerns a statement allegedly made at

verification as evidence that all of Kingtom's reporting regarding its sales processes are

unreliable:

> We found that the sales process described in the initial RFI Exhibit 18 is one way that
> Kingtom does sales; however during the demonstration of the accounting process **[**
>                 **]** *stated that occasionally they get calls from customers to purchase from*
> *inventory*. This statement is contradictory to Kingtom's submissions as there was no
> mention of this sales process or the maintenance of inventory in any of Kingtom's
> submissions.

C.R. 81 at 6 (emphasis added).  TRLED in the Initial Determination went on to state that

Kingtom attempts to explain this statement by referring to a "line item" on its financial

statements.  C.R. 86 at 11 (citing C.R. 83 at 29-30).  This statement demonstrates a failure to

understand Kingtom's Written Argument or to fully address its substance.  Even a cursory

review of Kingtom's Written Argument showed that Kingtom did not discuss any financial

statement line item, but was noting the monthly opening balances of finished goods inventory in

its monthly production reports:

> Kingtom submitted its monthly production summary reports which include the *opening inventory* of Kingtom's finished goods warehouse every month. . . . Kingtom also explained that "finished products are moved to warehouse until orders are completed"{} and that it maintains "finished goods inventory-in slips."  { C.R. 41 at 10 }.  CBP has been aware since EAPA Case No. 7348 that Kingtom maintains an inventory. As explained, "the supposition that Kingtom does not have any finished goods inventory is not only inaccurate and unsupported by substantial evidence, as discussed above, but also ignores commercial reality." { C.R. 70 at Exhibit 96 }.  Thus, the record supports that Kingtom maintains a finished goods inventory. It is illogical to conclude that Kingtom could not provide a customer finished goods from its warehouse if a customer calls to purchase more extrusions. Such extrusions, which would be otherwise waiting for other work orders to the same customer to be completed, could be withdrawn and shipped to the customer and Kingtom could easily produce more extrusions to make up the loss to inventory. Doing so infrequently is not inconsistent with Kingtom's sales process. { *See* C.R. 41 at Exhibit 18 }.

C.R. 83 at 29-30 (emphasis in original).  In light of the context of Kingtom's statement in its

written argument, it was clear that Kingtom was discussing the fact that on occasion customers

with multiple orders sometimes want products delivered in earlier shipments rather than waiting

for remaining products to be produced and prepared for shipment.  This could be due to a variety

of factors, but ultimately this results in already-ordered made-to-order products simply being

delivered sooner.  This *was* explained at verification, is normal in the course of business, and is

not a discrepancy that "suggests that information that Kingtom submitted regarding its sales and

inventory processes is unreliable."  C.R. 86 at 11.

In addition to these unsupported claims of discrepancies, AEFTC further claims that (1)

Chinese aluminum extrusions imported into the Dominican Republic after China and the

Dominican Republic established trade ties, (2) Kingtom purchasing minor raw materials and

[              ] from Chinese suppliers, and (3) individuals with China citizenship working at

NON-CONFIDENTIAL

Kingtom is substantial evidence that Kingtom is transshipping China-origin extrusions.  ECF 33 at 30-33.  It is not.  As an initial matter, the record of this case lacks a logical nexus between any import by Kingtom and any aluminum extrusion from China.  As discussed, Kingtom did not import any Chinese origin aluminum extrusions into the Dominican Republic.  Kingtom provided CBP an exhaustive list of its imports since January 2019 that was certified by the Dominican Government and that Kingtom expressly requested CBP to verify.  *See* Second Voluntary Submission at 2.[7]  The record is devoid of even a scintilla of evidence regarding transshipped or commingled Chinese extrusions.

Moreover, Kingtom transparently reported its Chinese **[            ]** and purchases of Chinese supplies such as **[            ]**.  *See* C.R. 41 at Exhibit 38; Second Voluntary Submission at Exhibit 83.  CBP verified both the Chinese **[            ]** and auxiliary materials.  The fact that Kingtom purchased Chinese auxiliary inputs and **[            ]** is wholly irrelevant to evasion in this case as it does not evidence that Kingtom commingled or transshipped Chinese origin aluminum extrusions.  AEFTC leaps a logical void from Kingtom's employees' heritage to the act of commingling or transshipping extrusions.

It is unclear how a company owned by expatriates that flies the flag of their home country, is operated by expatriates from that country, and was incorporated after the country of incorporation and the home country established diplomatic relations is evidence of transshipment of products from their home country.  Under this supposed "logical reasoning," any company operated by expatriates anywhere in the world must be transshipping merchandise.  This is plainly illogical.  Despite its employees being Chinese, the record furnishes zero evidence that a single aluminum extrusion is Chinese origin.

---

[7] *See supra* note 1.

In sum, none of the arguments raised by the AEFTC demonstrates that Kingtom's exports of aluminum extrusions included transshipped Chinese origin aluminum extrusions.  When viewed as a whole, the record lacks any evidence, let alone substantial evidence, that Kingtom could have commingled or transshipped Chinese origin aluminum extrusions.  AEFTC's illogical and misleading claims to the contrary do not make up for the dearth of factual evidence to support a finding of evasion.

**B.  ORR Correctly Determined That Adverse Inferences Were Not Appropriate**

Given that the record does not contain evidence of evasion, AEFTC claims that it was arbitrary and capricious for ORR to find that TRLED's claims regarding events at verification did not justify disregarding record evidence in favor of an adverse inference.   But the decision to apply adverse facts available is a discretionary one under the statute, and thus ORR was not bound by and did not have to defer to TRLED's application of adverse facts available under the *de novo* standard of review.  This decision was reasonable because the record does not contain any probative evidence that Kingtom failed to comply with a request for information or that the "discrepancies" identified by AEFTC resulted in a lack of information such that a reliance on facts otherwise available was necessary to fill gaps in the record.  Moreover, the facts otherwise available identified by AEFTC are not substantial evidence of evasion because there is no evidence on the record that Kingtom ever purchased aluminum extrusions from China.  There was, therefore, no basis for ORR to apply adverse inferences to Kingtom and its decision not to do so is reasonable and should be affirmed.

ORR correctly determined that the application of adverse inferences to Kingtom was not supported by the record. ORR observed that Kingtom actively participated in the investigation and demonstrated a willingness to provide additional information voluntarily.  C.R. 89 at 8. Therefore, based on its *de novo* review of the record, ORR did not believe that the application of

34

adverse inferences and the discounting of Kingtom's submitted information by TRLED was warranted. *Id.*

Section 517(c)(3)(A) of the Tariff Act permits CBP to "use an inference that is adverse to the interests" of a party if that party "has failed to cooperate by not acting to the best of {its} ability to comply with a request for information." 19 U.S.C. § 1517(c)(3)(A); 19 C.F.R. § 165.6(a). While the EAPA statute does not provide a definition for "acting to the best of its ability," the Federal Circuit defined the standard in the context of U.S. Department of Commerce ("Commerce") AD/CVD proceedings in *Nippon Steel Corp. v. United States*, 337 F.3d 1373 (Fed. Cir. 2003).

In *Nippon Steel*, the Federal Circuit clarified that, when an agency analyzes whether a party has acted to the "best of its ability," the agency must assess the party's abilities, efforts and cooperation in responding to requests to determine whether it has "put forth its maximum effort" to provide "full and complete answers to all inquiries," and that the standard "does not require perfection and recognizes that mistakes sometimes occur." *Id.* at 1382. The Federal Circuit thus established a two-part test for the agency:

> First, it must make an objective showing that a reasonable and responsible importer would have known that the requested information was required to be kept and maintained under the applicable statutes, rules, and regulations. . . . Second, {the agency} must then make a subjective showing that the respondent under investigation not only has failed to promptly produce the requested information, but further that the failure to fully respond is the result of the respondent's lack of cooperation in either: (a) failing to keep and maintain all required records, or (b) failing to put forth its maximum efforts to investigate and obtain the requested information from its records. An adverse inference may not be drawn merely from a failure to respond, but only under circumstances in which it is reasonable for {the agency} to expect that more forthcoming responses should have been made; i.e., under circumstances in which it is reasonable to conclude that less than full cooperation has been shown.

*Id*. at 1382-83 (internal citations omitted).

The principles and rationale behind the application of adverse inferences in proceedings conducted by Commerce, as delineated by the Federal Circuit in *Nippon Steel*, should also apply to EAPA investigations, as the same language authorizes the application of adverse inferences in both AD and CVD proceedings and evasion investigations.  Both Section 517 and Section 776 read as follows:  "{I}f the {agency} finds that {a party} has failed to cooperate by not acting to the best of {its} ability to comply with a request for information, the {agency may} use an inference that is adverse to the interests of that party in selecting from the facts otherwise available."  19 U.S.C. § 1517(c)(3)(A); 19 U.S.C. § 1677e(b)(1).  Therefore, as there is not yet an established body of law specifically addressing the application of adverse facts available in this context it is reasonable to look to the courts' interpretations of the adverse facts available statute in the context of Commerce's application as a guide.

According, only if substantial evidence supports that a party failed to cooperate to the best of its ability, may CBP "use an inference adverse to the interests of that party . . . in selecting from the facts otherwise available."  19 U.S.C. § 1517(c)(3)(A).  This is a discretionary decision.  In EAPA investigations, the adverse inference selected "may include information derived from: (i) the allegation," (ii) another evasion determination, or "any other available information."  19 U.S.C. § 1517(c)(3)(C);  19 C.F.R. § 165.6(b).  Therefore, CBP may not assume whatever facts it wants.  *See Changzhou Trina Solar Energy Co. v. United States*, 195 F. Supp. 3d 1334, 1350 (Ct. Int'l Trade 2016) ("{E}ven when using facts otherwise available with adverse inferences, an agency must still point to actual information on the record to make required factual determinations.").  CBP may not "bypass{ } the prerequisite factual findings to reach a legal conclusion," as it has an obligation "to make determinations that are supported by a reasonable reading of the record, including consideration of relevant evidence that 'fairly

NON-CONFIDENTIAL

detracts' from the reasonableness of its conclusions." *Id.* at 1350 (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).  The purpose of adverse inferences is to incentivize cooperation with requests for information, not to punish those from whom information is requested.  *See Nat'l Nail Corp. v. United States*, 390 F. Supp. 3d 1356, 1371 (Ct. Int'l Trade 2019); *Pro-Team Coil Nail Enter. v. United States*, 419 F. Supp. 3d 1319, 1333 (Ct. Int'l Trade 2019).

As support for its argument that ORR should have followed TRLED's application of adverse facts available AEFTC makes a number of arguments, none of which persuade.  First, AEFTC makes the unfounded claim that Kingtom informed TRLED at verification that Kingtom "deleted" pre-2020 records.  More specifically, TRLED claims in its verification report that, in 2020, "Kingtom deleted all records before January 2020" and that it was "unable to verify anything for the 2019 financial statements."  C.R. 81 at 5, 9, 13.  While pre-2020 records are irrelevant to the instant case, as the POI began in January 2020, Kingtom disputed TRLED's materially false mischaracterization and misleading statements regarding Kingtom's pre-2020 records.  C.R. 83 at 25.  The Verification Exhibits themselves contradict and disprove TRLED's statements.  Verification Exhibit 4 includes financial information for 2019 and in fact includes

[                                                                                      ].

C.R. 80 at Exhibit 4.  Verification Exhibit 4 also includes Kingtom's fixed asset subledger for 2019.  *Id*.  The verification exhibits include contracts with suppliers from 2019, material invoices from 2019, bank statement excerpts proving payment from 2019, screenshots from Kingtom's accounting system showing payments from 2019, customs declarations from 2019, bills of lading from 2019, freight invoices from 2019, a certificate of analysis and packing list for aluminum ingot from 2019, a production report from 2019, correspondence with suppliers from 2019, and

37

casting production records going back to 2017.  C.R. 80 at Exhibits 6-7.  If Kingtom had

"deleted records before January 2020" as AEFTC claims, Kingtom would not have been able to

provide this information to TRLED because this information would have been deleted.  TRLED

had no trouble comparing "Kingtom's unaudited Income Statement and Statement of Financial

Position for Year Ended *December 31, 2019*" with Kingtom's EAPA Case No. 7348 Exhibit 26.

C.R. 81 at 10 (emphasis added).  Thus, it was simply untrue for TRLED to claim it could not

verify any pre-2020 information as it could readily do so with the information provided and

actually did so at verification.  It was thus obvious to TRLED, *at verification*, that Kingtom had

not in fact "deleted" all records prior to 2020.  It was unreasonably disingenuous for TRLED to

misinterpret Kingtom's statement that it "overhauled" its accounting system to mean that it

deleted prior records, *see id*. at 4, especially given that TRLED should encourage companies

who improve their recordkeeping to comply with TRLED requirements rather than punish them

for it.

       The record also does not support TRLED's misleading statements. Kingtom submitted to

CBP, in 2021, its 2019 trial balance that TRLED claims Kingtom deleted in 2020.  *See, e.g.*,

C.R. 41 at Exhibit 6.  Kingtom submitted its die information and die designs including dies that it

created going back throughout the entirety of 2019.  *See* C.R. 54 at Exhibit 66.  If Kingtom had

deleted "all records" when it "overhauled" the accounting system in 2020, Kingtom would not

have had been able to provide this information in this investigation. Kingtom also submitted

import data for the full 2019 year and specifically requested that CBP verify that particular data,

*see* Second Voluntary Submission at 2, Exhibit 83, which CBP declined to do.  *See generally*

C.R. 81.  Kingtom even specifically requested that "CBP verify with particularity any and all

information that CBP is concerned may be inconsistent with Kingtom's previous EAPA

investigation responses." C.R. 70 at 3. Kingtom would not have asked CBP to verify data that it had deleted. Importantly, while the verification report expressly claims that it was "not able to verify the 2019 financial statements," the verification report does not state that it ever requested to verify such information. C.R. 81 at 9. This is because it actually never made such a request. CBP's statements insinuating that Kingtom was trying to hide or destroy relevant information are counterfactual and unsupported by the record. To the contrary, Kingtom acted transparently and encouraged CBP to verify this information.

Second, AEFTC argues that the intimidation of employees interfered with verification, as allegedly evidenced by Kingtom using "minders" to "intimidate workers into silence." ECF 33 at 16. Although the verification report claims that it appeared to CBP that a Kingtom official was there to intimidate employees, C.R. 81 at 15, CBP never asked what the company official was doing, and never asked in the moment to speak with employees in private. *See id.* The fact that a Kingtom official "{stood} nearby" their own employees does not evidence intimidation or evasion. It should come as no surprise to CBP or AEFTC that a supervisor would supervise their own employees during such an important event as a verification by CBP.

Furthermore, the official who allegedly "acted as a minder," *id.*, provided interpretive services and was required to be present because TRLED only included one interpreter in its 10-person team (which frequently broke into small groups). Moreover, TRLED was aware that Kingtom had its officials on site provide interpretive services during verification. *See id.* at 18. This need for interpretive services was further exacerbated by the fact that, despite Kingtom being located in a Spanish-speaking country and operated by individuals whose native language is Chinese, TRLED failed to bring an interpreter that could translate Chinese to English (and vice versa) or Chinese to Spanish (and vice versa) — TRLED's translator was only able to provide

English to Spanish (and vice versa) translation services.  Further, as TRLED's verification report acknowledges, a significant number of Haitian workers only spoke Creole, making communicating with such workers impossible without the assistance of Kingtom officials. C.R. 81 at 15 n.7.  Thus the conjecture that Kingtom had a "minder" that intimidated employees, is unsupported by the verification record and does not support the allegation that Kingtom failed to comply with a request from TRLED, but rather that Kingtom attempted to comply to the best of its ability by providing TRLED its employee's services when they were needed.

Finally, AEFTC's portrayal of the conclusion of verification is also inaccurate.  ECF 33 at 15-16.  Verification did not end abruptly but rather it ended as scheduled.  While the verification report discusses an incident that occurred on the last day of verification, the verification continued after the alleged incident as CBP collected additional outstanding exhibits. *See* C.R. 81 at 19.  Additionally, the referenced incident did not occur until after 4:30 pm on the last day of verification.  *See id*. at 18.  Thus, by the time that CBP finished collecting exhibits and its meeting in the conference room, verification concluded after close of business on the last day as scheduled.  *See id*. at 18–19.  The verification report does not even characterize the end of verification as premature; nor does it claim such message was conveyed to Kingtom's counsel at verification.  *See id*. at 19.  The fact that the verification report gives the impression that verification ended before it otherwise would have, despite the verification record clearly demonstrating the contrary, highlights the misleading nature of certain statements in the verification report, and the obligation on the part of CBP to strike those statements from the record, as Kingtom requested.[8]

---

[8] TRLED's verification report describes an "altercation instigated by Kingtom's counsel forcing their way into the conference room by not honoring the CBP/HIS team's request for privacy." C.R. 81 at 18-19.  This is not an accurate portrayal of events, and Kingtom vehemently objected

While TRLED's verification report indicated that CBP spoke with company employees privately about their concerns, *see id*. at 15, there is no indication that these company employees had any information that demonstrated that Kingtom was engaged in evasion, was commingling extrusions, or otherwise falsifying or hiding any of its records.  While Kingtom categorically denies that any gag order was put in place, the fact remains that if workers had in fact been terminated and were not afraid to speak to TRLED, then TRLED would have heard the truth from these workers.  Yet, there is nothing in TRLED's verification report that indicates that CBP learned anything from these workers that bears on the issue of evasion.  *See id*. at 15, 18-19. Certainly, if the "over 50" workers that contacted CBP had evidence that supported an evasion determination they would have shared it with CBP and it would be reflected in the verification report.  The absence of any such discussion in TRLED's verification report supports the conclusion that there was simply no such evidence of evasion to disclose.

### C.  ORR's Decision Is Consistent With Other EAPA Decisions

AEFTC also argues that because ORR's Final Determination is inconsistent with its reversed decisions in the two prior EAPA cases involving Kingtom that ORR's conclusions are erroneous.  This is plainly incorrect.  As an initial matter, as this Court is well aware, the fact that Kingtom did not transship aluminum extrusions from China through the Dominican Republic from October 9, 2018 through November 2, 2020 has been sustained and entered as final judgment.  *Global Aluminum Distributor LLC et al. v. United States*, Consol. Court No. 21-00198 (Ct. Int'l Trade Aug. 8, 2022).  Thus, ORR's June 15, 2022 finding of no evasion in the

---

to such statement remaining in the verification report as it impugned the professional integrity of Kingtom's counsel.  Such a defamatory portrayal of counsel's behavior is not appropriate in any report from a government agency.  *See* U.S. Customs and Border Protection Standards of Conduct, Directive No. 51735-013B ¶¶ 3.1, 7.4 (U.S. Customs and Border Protection Dec. 9, 2020).

7348 Remand Redetermination is consistent with ORR's June 29, 2022 Final Determination in the instant case.  ORR was not obligated to explain why its decision in the instant case differed from a decision that it had already explained was erroneous.

Moreover, as this Court is aware, at the time of ORR's Final Determination, the appeal of EAPA 7423 was stayed pending completion of briefing in *Global Aluminum* due to the substantial overlap in the records and decisions in the two cases.  *See H&E Home, Inc. et. al v. United States*, Consol. Court No. 21-00337, ECF 47 (Nov. 18, 2021).  Following the lifting of the stay in *H&E Home*, Consol. Court No. 21-00337, and the subsequent voluntary remand, ORR reversed its finding of evasion in a manner consistent with the sustained decision in *Global Aluminum*.  As a result, each decision that AEFTC claims ORR's Final Determination was inconsistent with are instead consistent with the Final Determination.

## VII.   <u>CONCLUSION</u>

For the foregoing reasons we respectfully request that this Court sustain CBP's Final

Determination.

Respectfully submitted,

/s/ Brady W. Mills
Brady W. Mills
Donald B. Cameron
Julie C. Mendoza
R. Will Planert
Mary S. Hodgins
Eugene Degnan
Jordan L. Fleischer
Nicholas C. Duffey

**MORRIS, MANNING & MARTIN LLP**
1401 Eye Street, N.W., Suite 600
Washington, D.C. 20005
(202) 212-4116

*Counsel to Kingtom Aluminio S.R.L.*

43

## **CERTIFICATE OF COMPLIANCE**

The undersigned hereby certifies that the foregoing brief complies with the Standard Chambers Procedures of the U.S. Court of International Trade in that it contains 13,231 words including text, footnotes, and headings and excluding the table of contents, table of authorities and counsel's signature block, according to the word count function of Microsoft Word 2016 used to prepare this brief.

/s/ Brady W. Mills
Brady W. Mills