NON-CONFIDENTIAL VERSION

## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

ALUMINUM EXTRUSIONS FAIR TRADE
COMMITTEE,

> Plaintiff,

v.

UNITED STATES,

> Defendant,

and

KINGTOM ALUMINIO S.R.L.,

> Defendant-Intervenor.

Before: Hon. Richard K. Eaton, Judge

Court No. 22-00236

**NON-CONFIDENTIAL VERSION**

Business Proprietary Information
Removed from Pages 5, 8-9, 11-12, 15-16

## REPLY BRIEF OF PLAINTIFF
## ALUMINUM EXTRUSIONS FAIR TRADE COMMITTEE

Alan H. Price, Esq.
Robert E. DeFrancesco, III, Esq.
Elizabeth S. Lee, Esq.

**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel for Aluminum Extrusions Fair
Trade Committee*

Dated: September 20, 2023

Ct. No. 22-00236                                                    NON-CONFIDENTIAL VERSION

# TABLE OF CONTENTS

Page

I.     INTRODUCTION ...........................................................................................1

II.    ARGUMENT ...............................................................................................1

    A.    Regulations and Rulings Acted Arbitrarily and Capriciously in Overturning TRLED's Decision to Apply Adverse Inferences ............................. 1

    B.    Regulations and Rulings Acted Arbitrarily and Capriciously in Reviewing the Record Evidence ........................................................... 6

    C.    Regulations and Rulings Acted Arbitrarily and Capriciously in Dismissing Evidence Indicating that Kingtom Sourced Chinese-Origin Aluminum Extrusions ................................................................. 14

    D.    Regulations and Rulings Acted Arbitrarily and Capriciously in Reaching Opposite Conclusions Based on the Same Evidence ........................... 16

III.    CONCLUSION ............................................................................................17

Ct. No. 22-00236                                           NON-CONFIDENTIAL VERSION

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*SKF USA Inc. v. United States*,
    263 F.3d 1369 (Fed. Cir. 2001)...................................................................................17

**Regulations**

19 C.F.R. § 165.2 ....................................................................................................5, 8

19 C.F.R. § 165.27(a)...................................................................................................6

19 C.F.R. § 165.45 .......................................................................................................6

## I.     INTRODUCTION

On behalf of Plaintiff Aluminum Extrusions Fair Trade Committee ("AEFTC"), we respectfully submit the following reply to the response briefs filed by Defendant United States ("Government") and Defendant-Intervenor Kingtom Aluminio S.R.L. ("Kingtom").  *See* Def.'s Resp. to Pl.'s Rule 56.2 Mot. for J. Upon the Agency R. (Aug. 23, 2023), ECF No. 38 ("Government Br."); Resp. Br. of Kingtom Aluminio S.R.L. in Supp. of Mot. for J. on the Agency R. (Aug. 23, 2023), ECF No. 41 ("Kingtom Br.").

## II.    ARGUMENT

U.S. Customs and Border Protection's ("CBP") administrative review determination in the administrative proceeding at issue, made by Regulations and Rulings of the Office of Trade ("Regulations and Rulings"), was arbitrary and capricious.  The defense attempts to provide post-hoc rationalization for Regulations and Rulings' determination in their briefs.  But this does not cure Regulations and Rulings' failure to grapple with the relevant issues in the first place. Regulations and Rulings failed to consider issues directly relevant to the question at hand, offered conclusory statements without analyzing the evidence, unreasonably interpreted the facts, and offered explanations that are contradicted by the evidence that was available to the agency.  The very fact that the Government and Kingtom provide extra reasoning at this stage to attempt to justify Regulations and Rulings' determination demonstrates that the agency's determination fails the standard of review.  In addition, the Government and Kingtom make incorrect or misguided claims in responding to AEFTC's arguments that are clarified below.

### A.     Regulations and Rulings Acted Arbitrarily and Capriciously in Overturning TRLED's Decision to Apply Adverse Inferences

The Trade Remedy Law Enforcement Directorate of CBP's Office of Trade ("TRLED"), which is tasked with conducting the EAPA investigation in the first place, applied adverse

inferences in making its determination of evasion due to Kingtom's failure to cooperate to the best of its ability.  Letter from Brian M. Hoxie, Director, Enf't Operations, Div., TRLED, CBP OT, re: *Notice of Determination as to Evasion* (Feb. 4, 2022), C.R. 86, P.R. 69, at 19 ("TRLED Determination").  Kingtom actively interfered with the agency's ability to verify the accuracy of information submitted by the company.  First, Kingtom prevented its workers from speaking with CBP officials at verification through intimidation.  Opening Br. of Pl. Aluminum Extrusions Fair Trade Committee (Apr. 25, 2023), ECF No. 33, at 15-16 ("AEFTC Br."); TRLED Determination at 18-19.  Second, Kingtom deleted relevant records.  AEFTC Br. at 17-20; TRLED Determination at 19.  In the face of such evidence, Regulations and Rulings concluded that Kingtom actively participated throughout the investigation and was willing to provide additional information voluntarily.  Letter from W. Richmond Beevers, Chief, Cargo Security, Carriers & Restricted Merchandise Branch, Regulations and Rulings, OT, CBP, re: *Enforce and Protect Act ("EAPA") Case Number 7550; Aluminum Extrusions from the People's Republic of China: Antidumping Duty Order, 76 FR 30650 (May 26, 2011) and Aluminum Extrusions from the People's Republic of China: Countervailing Duty Order, 76 FR 30653 (May 26, 2011); Kingtom Aluminio SRL; 19 U.S.C. § 1517* (June 29, 2022), C.R. 89, P.R. 81, at 8 ("R&R Determination").  The defense's arguments in support of Regulations and Rulings' determination are flawed.  The Government and Kingtom confuse the issue.  The issue is not whether Regulations and Rulings had the discretion to apply adverse inferences.  Government Br. at 7; Kingtom Br. at 34.  The issue is whether Regulations and Rulings acted arbitrarily and capriciously in dismissing evidence of Kingtom's failure to cooperate, which it did, as AEFTC explained in its opening brief and reiterates below.  Regulations and Rulings ignored important aspects of the problem and its conclusion is unreasonable.  The defense's arguments fail to demonstrate otherwise.

The Government and Kingtom argue that Regulations and Rulings' decision not to apply adverse inferences is supportable because of the agency's conclusion that Kingtom actively participated and was willing to provide additional information.  Government Br. at 7-8; Kingtom Br. at 34-35.  The defense's argument assumes the conclusion and is unpersuasive.  The Government also argues that Regulations and Rulings found that there were no instances in which Kingtom refused to provide requested information that Kingtom would otherwise have access to.  Government Br. at 7-8.  The Government, and Regulations and Rulings, misunderstands the purpose of verification.  The entire goal of verification is for the agency to verify information previously submitted by the investigated party.  By preventing its workers from speaking with CBP officials at verification, Kingtom was refusing to provide requested information that it had access to.  For the same reason, Kingtom's argument that there is no indication that its workers had any information that demonstrated that Kingtom was engaged in evasion is also unconvincing.  Kingtom Br. at 41.  In addition, that Kingtom participated in the investigation to an extent and chose to provide certain information does not absolve it from its failure to cooperate by withholding and destroying other information that was requested.  Again, Regulations and Rulings' conclusion sets dangerous precedent for agency proceedings.  It should be the agency that determines what information is necessary for its investigation, not the investigated party.

Kingtom provides further argument regarding the intimidation of workers that CBP officials observed at verification.  Kingtom suggests that it is not unusual for a supervisor to supervise employees during an event such as verification, and that the company official identified as a minder was providing interpretive services.  *Id.* at 39.  This is not an accurate description of the facts.  TRLED Determination at 18.  As TRLED explained in its determination, <u>all</u> members of the CBP verification team observed Kingtom's intimidation tactics.  *Id.*; Letter from TRLED,

re: *On-Site Verification Report EAPA Case No. 7550* (Nov. 9, 2021), C.R. 81, P.R. 57, at 15 ("Verification Report").  Eight workers were terminated from employment for speaking to CBP officials, and those workers confirmed that they were instructed by their supervisors to not speak with CBP officials or risk retaliation.  TRLED Determination at 18; Verification Report at 18-19. The record also contradicts Kingtom's claim that AEFTC inaccurately described the conclusion of verification.  Kingtom Br. at 40.  CBP explained in its report summarizing verification, which was attended by eight CBP officials, that:

> Due to concerns for safety from the {ever-growing} tensions, due to stories not coalescing, and the observed armed guard, the decision to conclude verification was made and all CBP/HSI Officials needed to regroup in the conference room in private.  After the CBP/HSI team had an altercation instigated by Kingtom's counsel forcing their way into the conference room by not honoring the CBP/HSI team's request for privacy, the team obtained the outstanding exhibits and concluded the on-site verification process.  We gathered our belongings and departed out of the building.

Verification Report at 18-19, Attachment 1.

With respect to Kingtom's deletion of records, the Government states that while TRLED noted the issue, its decision to apply adverse inferences was not predicated on this but rather, on Kingtom's lack of cooperation during verification.  *See* Government Br. at 8.  Regulations and Rulings was required to conduct a *de novo* review and, thus, should have considered Kingtom's deletion of records, which was material to TRLED's determination of evasion.  TRLED Determination at 17-19.  Regulations and Rulings concluded in its review that Kingtom actively participated in the investigation without any explanation of how such a conclusion reconciles with Kingtom's destruction of records.  R&R Determination at 8.  Regulations and Rulings entirely failed to consider an important aspect of the problem and made a conclusion that runs counter to the evidence before the agency.

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

Kingtom's arguments on this issue are also flawed.  Kingtom first claims that pre-2020 records are irrelevant because the period of investigation ("POI") for the case began in January 2020.  Kingtom Br. at 37.  Kingtom is incorrect.  The POI in an EAPA investigation defines the time period in which the imports of merchandise subject to the investigation entered the customs territory of the United States for consumption or were withdrawn from warehouse for consumption.  19 C.F.R. § 165.2; *see also* TRLED Determination at 3.  The POI for this case was January 8, 2020 through February 5, 2022.  TRLED Determination at 3.  For Kingtom's merchandise that was produced prior to 2020 and entered the United States during the POI, records prior to 2020 are necessarily relevant to the case.  CBP also has the discretion to investigate entries outside of the POI at its discretion.  19 C.F.R. § 165.2.

Kingtom's claim that it did not delete all pre-2020 records is also inaccurate.  Again, TRLED discovered at verification that Kingtom had deleted certain records from before January 2020.  Specifically, [                                                          ] explained that Kingtom overhauled its accounting system in 2020, allegedly because everything was done in Excel in the old system, which was not keeping up with its growth and the EAPA investigation.  Verification Report at 4.  [          ] stated that Kingtom deleted records prior to January 2020 because it "didn't see the point in keeping them."  *Id.*  TRLED explained in its determination:

> At verification Kingtom admitted to deleting records prior to January 2020.
> Kingtom's stated deletion of its original source records from before January 2020
> is problematic because copies of such records previously submitted to CBP in
> EAPA 7348 and 7423, *e.g.*, production records, financial records, sales records,
> were placed {on} the record of this investigation.  In other words, Kingtom deleted
> records that were previously submitted to CBP during EAPA investigations 7348
> and 7423.  Furthermore, despite Kingtom's claims to the contrary that it had pre-
> 2020 records available to review, CBP officials asked at verification to see pre-
> 2020 records, but Kingtom officials did not provide those to CBP because Kingtom
> advised CBP officials that such records were unavailable because Kingtom deleted
> them.

TRLED Determination at 17 (internal citations omitted).

That Kingtom provided CBP with copies and excerpts of certain documents prior to verification or may have had other records available does not change the fact that CBP Kingtom deleted necessary source records and prevented CBP from being able to verify Kingtom's prior submissions – the point of verification.  In sum, contrary to the defense's arguments, Regulations and Rulings' conclusion that Kingtom actively participated throughout the investigation and showed a willingness to provide information voluntarily is an unreasonable interpretation of the facts.

### B.   Regulations and Rulings Acted Arbitrarily and Capriciously in Reviewing the Record Evidence

The defense's response regarding the widespread discrepancies in Kingtom's submissions is also unpersuasive.  As an initial matter, Kingtom's claim that Regulations and Rulings did not owe any deference to TRLED's determination is misguided.  Kingtom Br. at 21.  Regulations and Rulings did not act in a vacuum.  Regulations and Rulings reversed TRLED's determination and, thus, needed to provide sufficient consideration of the initial determination.  R&R Determination at 11.  Furthermore, as part of a *de novo* review, Regulations and Rulings needed to consider the entire record, including evidence detracting from its conclusion, to provide substantial evidence in support of its determination.  *See* 19 C.F.R. §§ 165.27(a), 165.45.  The Government largely concedes that Regulations and Rulings did not address most of the discrepancies.  Government Br. at 10-13 (conceding that Regulations and Rulings did not directly address the discrepancies related to production records; employment records; raw material purchases and suppliers; and financial records).  Nonetheless, the Government argues generally that Regulations and Rulings found substantial evidence that Kingtom produced the necessary types and volumes of aluminum extrusions.  *See id.* at 10-14.  Kingtom provides its own explanations for the discrepancies and

argues that they are not evidence of evasion.   *See* Kingtom Br. at 23-34.   But neither the Government's nor Kingtom's arguments cure Regulations and Rulings' failure to grapple with these issues in the first place.   The discrepancies in Kingtom's submissions included issues related to production; sales; employee attendance and payroll; raw material purchases/suppliers; and financial records.   *See* TRLED Determination at 3-21.   The agency failed to adequately address, or at all, many of these discrepancies, as detailed in AEFTC's opening brief.   *See* AEFTC Br. at 19-30.   These discrepancies were directly relevant to evaluating Kingtom's production capability and actual production.   Thus, it was not sufficient for Regulations and Rulings to dismiss the discrepancies in a summary manner.   By failing to address the discrepancies in Kingtom's submissions, which were material and directly relevant to the question before the agency – whether Kingtom could and did produce all of the aluminum extrusions that it exported to the United States – Regulations and Rulings failed the standard of review.

AEFTC also addresses here certain claims made by the defense that are misguided, or flatly incorrect.   AEFTC first addresses general errors in the defense's arguments and then responds to the defense's claims regarding specific discrepancies.   First, the Government and Kingtom question the relevance of the discrepancies.   *See* Government Br. at 9-14; Kingtom Br. at 23-33.   Again, there were discrepancies involving issued related to production; sales; employee attendance and payroll; raw material purchases/suppliers; and financial records.   Because of these discrepancies, CBP could not confirm that there was actual production in the claimed volume, that there were enough hours worked to support the claimed production volume, or that Kingtom actually purchased from its suppliers what it claimed (instead of Chinese-origin aluminum extrusions).   The relevance of these discrepancies is clear.   The widespread discrepancies collectively undermine Kingtom's claims regarding its production of aluminum extrusions, and

BUSINESS PROPRIETARY INFORMATION
                                    HAS BEEN DELETED

the general reliability of the company's submissions.  Next, the Government and Kingtom argue that some of the discrepancies relate to records from prior to the POI of the instant investigation. The defense is misguided for three reasons.  First, Kingtom's submissions from the prior EAPA investigations involving Kingtom's products were placed on the record of the underlying investigation and are part of the record of this case.  TRLED Determination at 2.  Second, as TRLED explained, such discrepancies demonstrate that "Kingtom has a history of submitting highly inaccurate, possibly fraudulent, submissions riddled with contradictions," which "casts doubt on all Kingtom submissions in this proceeding."  *Id.* at 13.  Third, as described above, the POI is in reference to the period in which the merchandise enters the United States.  It is not a starting date for when records become relevant.  Records from prior to the POI of this investigation that relate to merchandise that entered during the POI are necessarily relevant, in addition to the fact that CBP has the discretion to investigate entries outside of the POI.  19 C.F.R. § 165.2.

*Production*

Kingtom's production records listed extrusion machines that Kingtom reported [

] the production records.  TRLED Determination at 12. In other words, Kingtom was claiming that it [

].  Kingtom claims that the [

] is not a discrepancy.  Kingtom Br. at 25 (citing TRLED Determination at 12).  Kingtom did not provide translated versions of the referenced production records and AEFTC cannot confirm the accuracy of Kingtom's claim.  Memorandum from CBP to the File, re: *Adding Certain Documents to the Administrative Record* (Aug. 13, 2021), C.R. 64, P.R. 45 at Attachment 2, Exhibit S-10 (Letter

BUSINESS PROPRIETARY INFORMATION
                                          HAS BEEN DELETED

from Sandler, Travis & Rosenberg, P.A., to CBP, re: *Kingtom Aluminio, Response to Supplemental Request for Information, EAPA Case Number: 7348* (June 17, 2020), C.R. 63, P.R. 44). Notwithstanding, it is unclear why [          ] production records would [

                                                                          ].    TRLED Determination at 12.    This continues to raise questions about the reliability of Kingtom's submissions.

TRLED also found discrepancies in [               ] work orders that TRLED examined at verification, with variances between the quantities of aluminum extrusions that Kingtom allegedly produced and the quantities that left Kingtom's facility.   AEFTC Br. at 22; Verification Report at 5-9; *see also* TRLED Determination at 16.   Kingtom claims that it produces more than the quantity ordered for unforeseen variables but that [

].   Kingtom Br. at 23-24.   The fact remains that for [                    ] work orders that TRLED randomly examined at verification, the quantities did not match up.   This, combined with the numerous other discrepancies on the record, called into question the reliability of Kingtom's claimed production volumes.

The Government and Kingtom rely heavily on the fact that Regulations and Rulings concluded that Kingtom had the ability to produce significant volumes of aluminum extrusions. But that does not mean that Kingtom produced the entire volume of the aluminum extrusions that it exported to the United States.   If Kingtom commingled or transshipped some Chinese-origin aluminum extrusions, that is still evasion within the meaning of the statute.   The numerous discrepancies existing in Kingtom's records call into question Kingtom's claims regarding its production.   This also demonstrates why the expert declarations that AEFTC submitted regarding

normal extrusion press capacity is extremely relevant, contrary to Kingtom's claims. *Id.* at 25-26. The fact that Kingtom may have demonstrated an ability to extrude "selected molds" on its presses does not mean that Kingtom could consistently and efficiently produce large shapes on smaller presses. TRLED Determination at 20; AEFTC Br. at 23-25.

*Employee Attendance and Payroll*

TRLED found at verification that Kingtom's local attendance sheet for January 2020 had no hours recorded for a night shift, contrary to Kingtom's claim that it has two 12-hour shifts per day, six days per week. TRLED Determination at 17; Verification Report at 16. Kingtom opines that CBP did not specify the workshop of the attendance sheet that it viewed and chose not to include any January 2020 attendance sheets, despite including attendance sheets from February 2020 onward. Kingtom Br. at 28. Yet, Kingtom claims that a blanket statement that it runs two shifts a day does not mean that it always runs two shifts a day. *Id.* at 27-28. An entire month without a night shift is clearly contradictory to the company's claim. Kingtom's claim that its questionnaire responses show that it did run two shift per day during January 2020, including a night shift, in some workshops but not others, only further proves the point. *Id.* at 28. The fact remains that when CBP attempted to verify Kingtom's submissions in this regard, the necessary records did not exist.

Another discrepancy was that while Kingtom claimed to use a facial recognition machine as one method of keeping track of local employees' timecards, it failed to provide a sample facial recognition report upon request. TRLED Determination at 16; Verification Report at 16. In this regard also, Kingtom was unable to demonstrate that its factory was operating at the capacity claimed. Kingtom claims – without citing to anything in the record – that this was the last item on the verification agenda and that CBP did not get to this item because it chose to end verification

**BUSINESS PROPRIETARY INFORMATION**
                                              **HAS BEEN DELETED**

early.  Kingtom Br. at 29.  To the contrary, CBP stated in its verification report that it requested a sample facial recognition machine report but was not provided with a copy.  Verification Report at 16.  In addition, Kingtom's claim here is contradicted by its own claim that verification did not end early.  Kingtom Br. at 40.

*Raw Material Purchases/Suppliers*

One of the discrepancies involved Kingtom's Chinese supplier [

], allegedly of raw materials and packaging supplies.  TRLED Determination at 9.  Kingtom's payments to the company allegedly included payments for the materials as well as Kingtom's Chinese workers' wages, but at verification CBP officials were unable to verify what portion of the bulk payments to [          ] was for supplies (including how much was paid for each item) and what portion was for employees' wages.  *Id.*; Verification Report at 17.  [                                                                       ] explained that Kingtom transfers money to [          ] to pay for raw material invoices and Kingtom's Chinese employees' salaries but that there is no detail on the transferred amount entered as an accounts payable in Kingtom's financials as to what portion is allocated to payroll and what portion is applied to invoices.  *Id.*  As a result, TRLED was unable to verify what Kingtom actually purchased from this Chinese supplier.  Kingtom's response is that it reconciles certain records to its financial accounting records on a rolling basis, and that because it previously notified CBP of this practice, there was no discrepancy.  Kingtom Br. at 29-30.  The fact remains that Kingtom did not have the necessary documentation to distinguish what payments were for materials and what payments for wages, again contributing to the other discrepancies that prevented CBP from confirming what Kingtom actually purchased from its suppliers.

**BUSINESS PROPRIETARY INFORMATION**
**HAS BEEN DELETED**

*Financial Records*

With respect to the discrepancies between Kingtom's financial statements submitted in this EAPA investigation and in one of the prior EAPA investigations involving imports of aluminum extrusions from Kingtom, which were also on the record of this investigation, Kingtom asserts that it has improved its recordkeeping and accounting since the prior EAPA investigations and that the later-submitted information supersedes prior information to the extent that there are inconsistencies. *Id.* at 30. Contrary to Kingtom's representation, the existence of discrepancies undermines, not improves, its credibility. Notably, Kingtom has no response with respect to the discrepancies between Kingtom's unaudited income statement and statement of financial position for 2020 submitted to TRLED in its RFI response compared to the versions TRLED reviewed at verification. TRLED Determination at 16; Verification Report at 10. These included [

                    ] the following line items: cost of sales, gross profit, net income and other comprehensive income, total assets, total liabilities, and total shareholders' equity. TRLED Determination at 16; Verification Report at 10.

Kingtom argues that it provided bank statements for the sample work orders for which TRLED requested proof of payment, in response to TRLED's statement that it could not verify Kingtom's bank information because Kingtom did not provide original source documents for certain banks at verification. Kingtom Br. at 31; Verification Report at 5; TRLED Determination at 15-16. The fact that Kingtom may have provided other information does not change the fact that CBP could not verify other information because Kingtom did not provide the necessary source documents.

*Sales Process*

The Government and Kingtom continue to miss the point with respect to Kingtom's conflicting statements regarding its sales process, as did Regulations and Rulings. Government Br. at 13-14; Kingtom Br. at 31-32. Kingtom previously reported to CBP in its questionnaire responses – both in the underlying investigation and in the two prior EAPA investigations involving Kingtom's products, that it produces merchandise to order. TRLED Determination at 10. Purchasing from inventory is distinct from a customer placing an order and that order (or the completed portion) sitting in inventory waiting to be shipped. Kingtom's statement at verification that it occasionally receives calls from customers to purchase from inventory was directly contradictory to its prior statements. *Id.*; Verification Report at 6. As TRLED explained, if an item is sold from inventory, it would require tracing by either determining the supplier or matching to Kingtom's production records. TRLED Determination at 10. Maintaining inventory means that Kingtom could have an opportunity to sell Chinese aluminum extrusions, or, at the very least, supplement its orders with commingled Chinese product. *Id.* at 11.

As demonstrated above, and in AEFTC's opening brief, AEFTC Br. at 21-30, there were widespread discrepancies directly relevant to evaluating Kingtom's production capability and actual production. These discrepancies indicated that Kingtom did not, in fact, produce all of the aluminum extrusions claimed, and undermined the reliability of Kingtom's submissions as a whole. Regulations and Rulings concluded that the discrepancies do not have sufficient bearing on Kingtom's production capability and actual production without analyzing most of the issues. For the few discrepancies it acknowledged, Regulations and Rulings unreasonably interpreted the facts. Regulations and Rulings failed to consider an important aspect of the problem and made an

unreasonable judgment in weighing the relevant factors, rendering its determination arbitrary and capricious.  The defense's arguments fail to demonstrate otherwise.

**C.      Regulations and Rulings Acted Arbitrarily and Capriciously in Dismissing Evidence Indicating that Kingtom Sourced Chinese-Origin Aluminum Extrusions**

Because of Kingtom's failure to cooperate, TRLED relied on adverse inferences in making its determination of evasion.  As adverse inferences, TRLED properly relied on record evidence indicating that Kingtom's imports included Chinese-origin aluminum extrusions.   TRLED Determination 19.   Regulations and Rulings failed to acknowledge that TRLED relied on Kingtom's ties to China as part of its application of adverse inferences due to Kingtom's failure to cooperate and, thus, it's dismissal of this evidence was arbitrary and capricious.  The defense's arguments are unconvincing for the same reason.

The Government and Kingtom opine that AEFTC provided general trade data, and not Kingtom's specific import data.  Government Br. at 14; Kingtom Br. at 33.  AEFTC would not have access to Kingtom's own import data and provided the best available information. Furthermore, the significant increase in Chinese exports of aluminum extrusions to the Dominican Republic shortly after Kingtom started operations in the country is relevant evidence, particularly because it does not align with the size of the extrusions market in the Dominican Republic.  AEFTC Br. at 31.  The Government is incorrect that AEFTC provided the trade data for a period different from the POI in this case.  Government Br. at 14.  AEFTC provided data for 2018 through the first half of 2020, which is the data that was available when AEFTC filed its allegation.  AEFTC Br. at 31; Letter from Wiley Rein LLP to CBP, re: *Aluminum Extrusions from the People's Republic of China: Request for an Investigation under the Enforce and Protect Act* (Oct. 5, 2020), C.R. 1, P.R. 1, at 12-13, Exhibit 9.  Furthermore, Kingtom would need to have imported Chinese-origin

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

aluminum extrusions prior to 2020 for its shipments that entered the United States starting in January 2020.  Again, the Government misunderstands the meaning of the POI in an EAPA investigation.

In this regard, Kingtom is misguided in its reliance on certain Dominican customs data in claiming that it was impossible for it to commingle or transship Chinese-origin aluminum extrusions because it never imported Chinese extrusions into the free trade zone in which it is located is incorrect.  Kingtom Br. at 19-20.  AEFTC explained to Regulations and Rulings that imports and exports from the free trade zone may not account for purchases through other Dominican middlemen or trading companies that would not be evident from Dominican customs authority data.  Letter from Wiley Rein LLP to CBP, re: *HQ Case No. H324349, Administrative Review of EAPA Case No. 7550, Investigation into Kingtom Alumino S.R.L.: Alleger's Response to Request for Administrative Review* (Apr. 19, 2022), C.R. 88, P.R. 76, at 9.  Kingtom may have also purchased Chinese-origin aluminum extrusions, including as "scrap" from another Dominican company that had initially imported them.  If those extrusions entered the free trade zone in which Kingtom operates by truck, Kingtom would have listed them as domestic purchases, but, when exported to the United States, they would still be transshipped Chinese extrusions.  *Id.* at 10.  Kingtom also only provided the data starting in January 2019, when it began operating in the Dominican Republic around April 2018.  *Id.* at 9.

The Government is also misguided in arguing that the fact that Kingtom sources [                                    ] from China is not evidence of evasion.  Government Br. at 15.  Kingtom argues that the fact that it purchased Chinese auxiliary inputs and [            ] is wholly irrelevant to evasion.  Kingtom Br. at 33.  Kingtom misses the point, as did Regulations and Rulings on this issue.  Because of the discrepancies in Kingtom's submissions, CBP could not

**BUSINESS PROPRIETARY INFORMATION**
**HAS BEEN DELETED**

confirm what Kingtom actually sourced from its suppliers, *i.e.*, the agency could not confirm that Kingtom did not obtain Chinese-origin aluminum extrusions.  Regulations and Rulings' dismissal of the evidence regarding Kingtom's sourcing of raw materials, [

], without addressing these discrepancies, was unreasonable.  R&R Determination at 10-11.

### D.     Regulations and Rulings Acted Arbitrarily and Capriciously in Reaching Opposite Conclusions Based on the Same Evidence

As detailed in AEFTC's opening brief, Regulations and Rulings previously relied on similar, and overlapping, evidence to find that imports of aluminum extrusions from Kingtom included transshipped or commingled Chinese-origin aluminum extrusions.  AEFTC Br. at 33-36. The record of this investigation included Kingtom's submissions in the two prior EAPA investigations involving imports of aluminum extrusions from Kingtom, in which TRLED found evasion and Regulations and Rulings affirmed the evasion findings.  *Id.* at 7-8.  Regulations and Rulings did not provide sufficient justification for treating the similar situations differently.  In this case, CBP had the benefit of conducting a verification of Kingtom, which proved that Kingtom failed to cooperate to the best of its ability and further supported a finding of evasion.  The Government and Kingtom respond that Regulations and Rulings' determination is not arbitrary and capricious because the CBP reversed its determinations in the two prior cases.  Government Br. at 15-17; Kingtom Br. at 41-42.  The defense's argument avoids the issue.  That the agency chose to reverse course in the prior cases does not change the fact that it reached opposite conclusions based on the same evidence.  Regulations and Rulings did not even acknowledge its prior findings, let alone provide sufficient reason for treating similar situations differently.  *See SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001).  This is the very definition

of arbitrary and capricious behavior, and Regulations and Rulings' determination fails the standard the review.

## III.    <u>CONCLUSION</u>

For the reasons above, and in AEFTC's opening brief, AEFTC respectfully requests that the Court find Regulations and Rulings' determination to be arbitrary, capricious, and an abuse of discretion and remand the decision for reconsideration consistent with the Court's opinion.

Respectfully submitted,

*/s/ Robert E. DeFrancesco, III*
Alan H. Price, Esq.
Robert E. DeFrancesco, III, Esq.
Elizabeth S. Lee, Esq.

**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel for Aluminum Extrusions Fair Trade Committee*

Dated:  September 20, 2023

CERTIFICATE OF COMPLIANCE

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for the Aluminum Extrusions Fair Trade Committee's Reply Brief, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2019), is 4,945 words.

*/s/ Robert E. DeFrancesco, III*
(Signature of Attorney)

Robert E. DeFrancesco, III
(Name of Attorney)

Aluminum Extrusions Fair Trade Committee
(Representative Of)

September 20, 2023
(Date)