Slip Op. 24-72

UNITED STATES COURT OF INTERNATIONAL TRADE

———————————————————
                                                    :
ALUMINUM EXTRUSIONS FAIR TRADE          :
COMMITTEE,                                          :
                                                    :
                  Plaintiff,                        :
                                                    :          Before: Richard K. Eaton, Judge
          v.                                        :
                                                    :          Court No. 22-00236
UNITED STATES,                                      :
                                                    :          **PUBLIC VERSION**
                  Defendant,                        :
                                                    :
          and                                       :
                                                    :
KINGTOM ALUMINIO S.R.L.,                            :
                                                    :
                  Defendant-Intervenor.             :
                                                    :
———————————————————

**<u>OPINION</u>**

[U.S. Customs and Border Protection's negative evasion determination is sustained.]

Dated: June 13, 2024

*Elizabeth S. Lee*, Wiley Rein LLP, of Washington, D.C., argued for Plaintiff Aluminum Extrusions Fair Trade Committee. With her on the brief were *Alan H. Price* and *Robert E. DeFrancesco, III*.

*Alexander J. Vanderweide*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of New York, N.Y., argued for Defendant the United States. With him on the brief were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Patricia M. McCarthy*, Director, *Justin R. Miller*, Attorney-In-Charge, International Trade Field Office, and *Aimee Lee*, Assistant Director. Of counsel was *Tamari J. Lagvilava*, Office of Chief Counsel, U.S. Customs and Border Protection.

*Jordan L. Fleischer*, Morris, Manning & Martin, LLP, of Washington, D.C., argued for Defendant-Intervenor Kingtom Aluminio S.R.L. With him on the brief were *Brady W. Mills*, *Donald B. Cameron*, *Julie C. Mendoza*, *R. Will Planert*, *Mary S. Hodgins*, *Eugene Degnan*, and *Nicholas C. Duffey*.

Eaton, Judge: Under the Enforce and Protect Act ("EAPA"),[1] U.S. Customs and Border Protection ("Customs") determines whether an importer has entered merchandise, that is subject to an antidumping or countervailing duty order, into the United States through evasion, resulting in the avoidance of paying the duties owed under the order. *See* 19 U.S.C. § 1517 (2018).

Plaintiff Aluminum Extrusions Fair Trade Committee ("Plaintiff") is a coalition of U.S. aluminum extrusion producers. By its motion for judgment on the agency record, Plaintiff challenges Customs' final negative evasion determination, i.e., that substantial record evidence does not support a determination that Defendant-Intervenor Kingtom Aluminio S.R.L. ("Kingtom"), a Chinese-owned aluminum extrusion producer in the Dominican Republic,[2] entered Chinese-origin aluminum extrusions[3] into the United States through evasion. *See* Notice of Final Determination as to Evasion, EAPA Case No. 7550 (June 29, 2022) ("Negative Evasion Determination"), PR 81, CR 89, ECF No. 21; *see also* Pl.'s Br. Supp. Mot. J. Agency R., ECF No. 33 ("Pl.'s Br."); Pl.'s Reply Br., ECF No. 44.

---

[1]     The EAPA was enacted as part of the Trade Facilitation and Trade Enforcement Act of 2015, Pub. L. No. 114-125, § 421, 130 Stat. 122, 161 (2016), which added section 517 to the Tariff Act of 1930.

[2]     Since 2019, Kingtom has imported its aluminum extrusions into the United States as a foreign importer of record. *See* Notice of Determination as to Evasion, EAPA Case No. 7550 (Feb. 4, 2022) at 5, PR 69, CR 86, ECF No. 21.

[3]     Aluminum extrusions from China are subject to antidumping and countervailing duty orders. *See Aluminum Extrusions from the People's Republic of China: Antidumping Duty Order*, 76 Fed. Reg. 30,650 (Dep't of Commerce May 26, 2011); *Aluminum Extrusions From the People's Republic of China: Countervailing Duty Order*, 76 Fed. Reg. 30,653 (Dep't of Commerce May 26, 2011).

Defendant the United States ("Defendant"), on behalf of Customs, and Defendant-Intervenor Kingtom ask the court to sustain the Negative Evasion Determination. *See* Def.'s Resp. Opp'n Mot. J. Agency R., ECF No. 38 ("Def.'s Resp."); Def.-Int.'s Resp.,[4] ECF No. 41.

This Court has jurisdiction over EAPA cases pursuant to 19 U.S.C. § 1517(g)(1) and 28 U.S.C. § 1581(c) (2018). For the following reasons, the Negative Evasion Determination is sustained.

## LEGAL FRAMEWORK

### I.    Evasion Determinations Under the EAPA

Under the EAPA, Customs determines whether covered merchandise has entered the United States through evasion. *See* 19 U.S.C. § 1517(c)(1). "Covered merchandise" is merchandise that is subject to an antidumping or countervailing duty order. *Id.* § 1517(a)(3). As defined by the statute, "evasion" means

> entering covered merchandise into the customs territory of the United States by means of any document or electronically transmitted data or information, written or oral statement, or act that is material and false, or any omission that is material, and that results in any cash deposit or other security or any amount of applicable antidumping or countervailing duties being reduced or not being applied with respect to the merchandise.

*Id.* § 1517(a)(5)(A). Customs has promulgated regulations providing the requirements for filing allegations of evasion and requests for investigation, investigation procedures, and administrative review of determinations as to evasion of antidumping or countervailing duty orders. *See* 19 C.F.R. § 165.0 (2020).

---

[4]    Though styled as "Response Brief of Kingtom Aluminio S.R.L in Support of Motion for Judgment on the Agency Record," in substance it is a response in opposition to Plaintiff's motion.

The EAPA authorizes Customs to use adverse inferences when making an evasion determination:

> If the [Commissioner of U.S. Customs and Border Protection] finds that a party or person . . . has failed to cooperate by not acting to the best of the party or person's ability to comply with a request for information, the Commissioner may, in making a[n evasion] determination under [19 U.S.C. § 1517(c)(1)], use an inference that is adverse to the interests of that party or person in selecting from among the facts otherwise available to make the determination.

19 U.S.C. § 1517(c)(3)(A); *see* 19 C.F.R. § 165.6(a). An adverse inference "may be used . . . without regard to whether another person involved in the same transaction or transactions under examination has provided the information sought by the Commissioner, such as import or export documentation." 19 U.S.C. § 1517(c)(3)(B); *see* 19 C.F.R. § 165.6(c).

In other words, Customs may decide to use adverse inferences, whether or not information is missing from the record, if it finds that the person from whom Customs has requested information failed to cooperate with that request to the best of its ability. *See CEK Grp. LLC v. United States*, 47 CIT __, __, 633 F. Supp. 3d 1369, 1378-79 (2023) (rejecting the argument "that adverse inferences as defined by § 1517(c)(3) can only be applied when there is a gap in the record," and finding that according to the plain meaning of that statute, "whether a gap exists is not necessarily determinative" of whether Customs may use an adverse inference).

When Customs applies adverse inferences, it may rely on information derived from "(i) the allegation of evasion of the trade remedy laws, if any, submitted to [Customs]; (ii) a determination by the Commissioner in another investigation, proceeding, or other action regarding evasion of the unfair trade laws; or (iii) any other available information." 19 U.S.C. § 1517(c)(3)(C).

## II.    Investigations and Administrative Appeals Under the EAPA

Customs' Office of Trade handles EAPA cases. In particular, the Trade Remedy Law Enforcement Directorate ("TRLED"), within the Office of Trade, investigates allegations of evasion and makes an initial evasion determination. *See* 19 U.S.C. § 4371(a)(3) (authorizing TRLED to direct EAPA enforcement efforts); *see also* 19 C.F.R. § 165.1 (defining TRLED as "the Trade Remedy Law Enforcement Directorate, Office of Trade, that conducts the investigation of alleged evasion under this part").

The EAPA establishes the requirements for TRLED to initiate an investigation and to implement interim measures.[5] *See* 19 U.S.C. § 1517(b)(1) ("Not later than 15 business days after receiving an allegation . . . the Commissioner shall initiate an investigation if the Commissioner determines that the information provided in the allegation . . . *reasonably suggests* that covered merchandise has been entered into the customs territory of the United States through evasion." (emphasis added)); *see also id.* § 1517(e)(1)-(3) (enumerating the interim measures that Customs shall implement if, "[n]ot later than 90 calendar days after initiating an investigation under subsection (b) with respect to covered merchandise, the Commissioner . . . decide[s] based on the investigation [that] there is a *reasonable suspicion* that such covered merchandise was entered into the customs territory of the United States through evasion" (emphasis added)).

Ultimately, TRLED must determine whether substantial evidence supports a finding that "covered merchandise was entered into the customs territory of the United States through evasion."

---

[5]    Interim measures include the suspension of liquidation of unliquidated entries of covered merchandise that entered on or after the initiation of the investigation, extension of the period for liquidating unliquidated entries of covered merchandise that entered before the investigation was initiated, and "such additional measures as the Commissioner determines necessary to protect the revenue of the United States, including requiring a single transaction bond or additional security or the posting of a cash deposit with respect to such covered merchandise." 19 U.S.C. § 1517(e)(1)-(3).

*See id.* § 1517(c)(1)(A) (providing that "the Commissioner shall make a determination, *based on substantial evidence*, with respect to whether such covered merchandise was entered into the customs territory of the United States through evasion" (emphasis added)).

Once TRLED has concluded its investigation and should it make an affirmative evasion determination, the EAPA permits an administrative appeal of that determination. *See id.* § 1517(f)(1) ("[A] person determined to have entered . . . covered merchandise through evasion or [the] interested party that filed [the] allegation . . . may file an appeal with the Commissioner for de novo review of the [TRLED's initial evasion] determination.").

After a request for administrative appeal is filed, Customs' Office of Regulations and Rulings ("R&R"), within the Office of Trade, considers the appeal, applying a de novo standard of review. *See* 19 C.F.R. § 165.1 (defining Regulations and Rulings). R&R has sixty days to complete its review. *See* 19 U.S.C. § 1517(f)(2).

Thereafter, parties may seek judicial review of TRLED's initial evasion determination and R&R's review of that determination in this Court. *See id.* § 1517(g)(1) (permitting parties to "seek judicial review of the [TRLED] determination under subsection (c)[6] and the [R&R] review under

---

[6]     Subparagraph (c)(1)(A) provides:

Except as provided in subparagraph (B), not later than 300 calendar days after the date on which the Commissioner initiates an investigation under subsection (b) with respect to covered merchandise, the Commissioner shall make a determination, based on substantial evidence, with respect to whether such covered merchandise was entered into the customs territory of the United States through evasion.

19 U.S.C. § 1517(c)(1)(A).

subsection (f)[7] in the United States Court of International Trade to determine whether the determination and review is conducted in accordance with subsections (c) and (f).").

# BACKGROUND

## I.    TRLED's Investigation and Affirmative Evasion Determination

### A.    Initiation of EAPA Investigation Number 7550 and Imposition of Interim Measures

On October 5, 2020, Plaintiff filed with TRLED an allegation that Defendant-Intervenor Kingtom had imported Chinese-origin aluminum extrusions into the United States by transshipping[8] them through the Dominican Republic, which resulted in the avoidance of paying the applicable antidumping and countervailing duties. *See* Letter from Wiley Rein LLP to Customs (Oct. 5, 2020) ("Allegation") at 6, PR 1, CR 1.

---

[7]       Paragraph (f)(1) provides:

Not later than 30 business days after the Commissioner makes a determination under subsection (c) with respect to whether covered merchandise was entered into the customs territory of the United States through evasion, a person determined to have entered such covered merchandise through evasion or an interested party that filed an allegation under paragraph (2) of subsection (b) that resulted in the initiation of an investigation under paragraph (1) of that subsection with respect to such covered merchandise may file an appeal with the Commissioner for de novo review of the determination.

19 U.S.C. § 1517(f)(1).

[8]       "Transshipment [is] where goods are manufactured in one country and imported through an intermediary country to evade duties imposed on goods originating from the manufacturing country . . . ." *Skyview Cabinet USA, Inc. v. United States*, No. 22-00080, 2023 WL 4073781, at *6 (CIT June 20, 2023) (citing *CEK Grp. LLC*, 47 CIT at __, 633 F. Supp. 3d at 1378-80). Customs' recently amended regulations identify transshipment as an example of evasion. *See Investigation of Claims of Evasion of Antidumping and Countervailing Duties*, 89 Fed. Reg. 19,239, 19,258 (Dep't of Homeland Sec. Mar. 18, 2024) (final rule) (amending 19 C.F.R. § 165.1 definition of "*Evade* or *Evasion*" to add examples of evasion, "includ[ing] but . . . not limited to, the transshipment, misclassification, and/or undervaluation of covered merchandise").

On January 8, 2021, TRLED acknowledged receipt of the Allegation. *See* Mem. From Kristina Horgan, Chief, EAPA Investigations Branch to File (Feb. 2, 2021) ("Investigation Initiation Memo") at 1-2, PR 4, CR 2, ECF No. 21.

On February 2, 2021, TRLED initiated EAPA Investigation Number 7550, having found that the information in the Allegation "reasonably suggest[ed] that covered merchandise entered into the customs territory of the United States by means of evasion." *Id.* at 1; *see* 19 U.S.C. § 1517(b)(1) ("Not later than 15 business days after receiving an allegation . . . the Commissioner shall initiate an investigation if the Commissioner determines that the information provided in the allegation . . . reasonably suggests that covered merchandise has been entered into the customs territory of the United States through evasion."). The period of investigation commenced on January 8, 2020,[9] and continued through the pendency of Case Number 7550, ending on February 5, 2022. *See* Notice of Determination as to Evasion, EAPA Case No. 7550 (Feb. 4, 2022) ("Affirmative Evasion Determination") at 3, PR 69, CR 86, ECF No. 21 (stating that the period of investigation was "January 8, 2020, through the pendency of this investigation, *i.e.*, February 5, 2022").

On May 10, 2021, TRLED imposed interim measures, having found that the information in the Allegation "support[ed] a reasonable suspicion that Kingtom entered covered merchandise into the customs territory of the United States through evasion." Letter from Brian M. Hoxie, Director, Enf't Operations Div., TRLED, to Counsel for Kingtom and the Committee (May 10, 2021) ("Interim Measures Letter") at 1, PR 12, CR 9; *see also* 19 U.S.C. § 1517(e)(1)-(3)

---

[9]       Under Customs' regulations, entries subject to investigation are "those entries of allegedly covered merchandise made within one year before the receipt of an allegation." 19 C.F.R. § 165.2. As noted, here, TRLED acknowledged receipt of the allegation on January 8, 2021. Thus, the period of investigation commenced on January 8, 2020.

(enumerating the interim measures that Customs shall implement if "the Commissioner . . . decide[s] based on the investigation [that] there is a reasonable suspicion that such covered merchandise was entered into the customs territory of the United States through evasion"). As interim measures, TRLED stated that it would "suspend the liquidation of each unliquidated entry of such covered merchandise that entered on or after February 2, 2021, the date of the initiation of the investigation" and "extend the period for liquidating each unliquidated entry of such covered merchandise that entered before the date of the initiation of the investigation." Interim Measures Letter at 8. Additionally, TRLED would "take such additional measures as the Commissioner determines necessary to protect the revenue of the United States, including requiring a single transaction bond or additional security or the posting of a cash deposit with respect to such covered merchandise." *Id.* Finally, "[Customs] [would] require live entry[10] and reject any non-compliant entry summaries, as well as require refiling of entries that are within the entry summary rejection period," and "evaluate Kingtom's continuous bonds to determine sufficiency." *Id.*

### B.  The Administrative Record in Case Number 7550

Between June and August 2021, TRLED sent initial and supplemental requests for information to Kingtom and received timely responses. Kingtom also made voluntary submissions of factual information. Plaintiff responded to these voluntary submissions and placed information on the record itself.

---

[10]     "Live entry" procedures require the importer of record "to provide necessary paperwork and pay duties *before* the imported merchandise is released into the U.S. market," to allow Customs to confirm entry paperwork is in order, which contrasts with "routine requirements that allow imports to be released into the U.S. market days before the importer is required to file paperwork and pay duties." *See* Melissa M. Brewer & Paul C. Rosenthal, *CBP Ramps Up Enforcement Efforts With "Live Entry" Requirements for Steel Imports Subject to AD/CVD Orders*, KELLEY DRYE & WARREN LLP (Mar. 30, 2016) https://www.lexology.com/library/detail.aspx?g=0d21a208-8a9d-4a53-be72-727978d7f6b4 (last visited May 31, 2024) (emphasis added).

Additionally, TRLED placed on the record of Case Number 7550 the administrative records of two previously commenced EAPA investigations, i.e., Case Numbers 7348 and 7423. These two investigations also involved allegations that Kingtom transshipped Chinese-origin aluminum extrusions through the Dominican Republic. The previously commenced investigations' respective periods of investigation overlapped with the first eleven months of the period of investigation in Case Number 7550 now before the court, i.e., from January 2020 to November 2020.[11]

**C.  TRLED's On-Site Verification at Kingtom's Facilities in the Dominican Republic**

From August 30, 2021, through September 2, 2021, Customs conducted on-site verification in the Dominican Republic of Kingtom's information.[12] Thereafter, TRLED issued a verification report. *See* On-Site Verification Report EAPA Case No. 7550 (Nov. 9, 2021) ("Verification Report"), PR 57, CR 81, ECF No. 21. Though Kingtom has been involved in a total of three TRLED investigations, this was the only one in which there was a verification. Def.'s Resp. at 16 ("EAPA 7550 is the sole investigation to benefit from [Customs'] site verification of Kingtom's facilities.").

---

[11]      *See* Affirmative Evasion Determination at 6 ("The [period of investigation] for EAPA 7348 was October 9, 2018, to November 19, 2020. The [period of investigation] for EAPA 7423 was January 10, 2019, to January 28, 2021. Accordingly, . . . all three cases' [periods of investigation] overlap by about 11 months, *i.e.*, from January 2020 to November 2020."). In neither of the prior investigations did Customs conduct verification of the information on the record.

[12]      Unlike in an antidumping or countervailing duty investigation, where verification of the information relied upon in making a final determination is required by statute, verification is not required in an investigation under the EAPA. *See* 19 U.S.C. § 1517(c)(2)(B) ("In making a determination . . . with respect to covered merchandise, the Commissioner may collect such additional information as is necessary to make the determination through such methods as the Commissioner considers appropriate, including by . . . conducting verifications, including on-site verifications, of any relevant information.").

TRLED verified information submitted by Kingtom regarding, inter alia, its ownership, record keeping, operations, production, and sales. Kingtom's owners are Chinese nationals who are residents of the Dominican Republic.[13] *See* Verification Report at 2. The owners provided startup money to begin operations in September 2016. *Id.*

Regarding record keeping, the verifiers observed that Kingtom's records, including financial statements, dated back to the start of the period of investigation, i.e., January 2020, but not before. Kingtom stated that when the company overhauled its accounting system in 2020, all records from before January 2020 were deleted. *Id.* at 4. As a result of the deletions, some information from the records of the prior investigations that had been placed on the record here (Case Numbers 7348 and 7423), which covered periods of investigation that started in 2018 and 2019, could not be verified during the on-site investigation. *Id.* It is worth noting, however, that according to the Verification Report, "[t]he parameters of the EAPA investigation [at issue] covered entries filed by Kingtom from January 8, 2020 through the pendency of the investigation," i.e., the investigation did not cover entries made before the period of investigation. *Id.* at 2.

As to production, Kingtom's production process "includes melting, billet casting, extrusion, powder painting or anodizing and packaging." *Id.* Kingtom sourced raw materials, such as aluminum ingots and aluminum scrap, from local suppliers in the Dominican Republic and abroad.[14] *Id.* at 4.

---

[13]    The owners are [[                                                        ]]. *See* Verification Report at 2-3.

[14]    Kingtom's Vice President of Sales [[                    ]] identified the country of origin of aluminum ingots to include  Russia, India, South Africa, Oman, and Canada, and for aluminum scrap to include the United States, Japan, and India. *See* Verification Report at 4. Kingtom also sourced equipment and materials from  China. *See* Affirmative Evasion Determination 7-9.

Significantly, Customs was able to verify Kingtom's capability and capacity to make aluminum extrusions in the amounts exported to the United States during the period of investigation:

> During our factory tour, we verified Kingtom's capability to produce aluminum extrusions by validating the production process flowchart . . . and the equipment listed on the [updated equipment list]. The team verified the list of machinery, functions, and quantity of machines on-site and noticed a large number of material supplies, such as powders were of Chinese origin.[15]

---

[15]    The report further stated:

Kingtom had three casting furnaces which they claimed have a monthly capacity of 4500 tons. . . .

Kingtom had nine extrusion machines all of which were Chinese made and the operated terminals were all in Chinese with one-word English subtitles. . . . All extrusion presses appeared to be operational. The nine extrusion machines had production capacity which ranged from 638 tons for their 4 inch diameter press to 2,200 tons for their 8 inch press.

Kingtom claims the maximum capacity of their extrusion machines is about 36,000 tons per year. Capacity information was verbally provided to us by Kingtom's Vice President of Sales, . . . which we verified against [a record document]. [Kingtom's official] stated that [e]xtrusion machine number 11 with model number MSH-2200T was the biggest machine able to extrude 8 inch billets with an approximate monthly capacity of 600 metric tons. The capacity of extrusion machine number 11 was consistent with what was listed on the equipment list . . . . We verified that Kingtom had a horizontal and vertical powder coating line which they claim have an annual capacity of about 38,400 tons. We verified that the maximum length of the extrusions are 40 feet[.]

We verified that Kingtom had a quality control lab that uses optical emission spectrometer for analysis of aluminum allow and certifies the chemical composition and tensile strength of their extrusions. . . .

We verified that Kingtom had an anodizing room where an electrochemical process takes place in which metal is immersed in a series of tanks. The process converts the metal surface into a decorative, durable, corrosion-resistant, and anodic oxide finish.

We verified that Kingtom had a powder coating room for extrusions scheduled to be powder coated rather than anodized.

Verification Report at 11.

In addition to production capacity, the verifiers confirmed Kingtom's actual production for the period of investigation. For example, the Verification Report compared amounts produced by Kingtom per month, as tracked by a software program at the factory, and the total export amounts (to anywhere) reported by Kingtom in its voluntary submission.[16]

As to Kingtom's sales during the period of investigation, TRLED verified ten work orders. For each work order, TRLED reviewed whether there were any issues related to documentation of raw material inputs for the order, e.g., aluminum ingots. No issues related to the aluminum ingot documents were identified for any of the work orders. *Id.* at 7-10.

For each order, TRLED also compared the number of units (aluminum extrusions) shipped and invoiced to a U.S. customer with the number of units produced. With respect to each of the

---

We verified that Kingtom had a packaging and shipping area where extrusions are labeled and packaged for transport. Additionally, we verified that Kingtom had a mold storage room where the molds used in the extrusion process are stored.

We verified Kingtom's extrusion process using the nine molds listed below. Dimensions of the extrusions machines were verified. Kingtom was able to adequately demonstrate their ability to extrude the selected molds and produced them as per schematic specifications, however, a demonstration of Mold [[            ]] was not performed but it appeared consistent with the schematic specifications provided by Kingtom. . . .

        . . . .

The team verified the monthly production capacity per extrusion machine . . . for the months of February 2020, March 2020, September 2020, November 2020, February 2021, March 2021, and April 2021.

Verification Report at 11-13.

[16]    *See* Verification Report at 15 (showing that during the period of investigation Kingtom produced more units than it exported to any other country).

ten work orders, TRLED observed and recorded several "variances," or differences, based on

Kingtom's documents provided during verification.[17]

Although not on point with the information the verifiers were hoping to examine, the

Verification Report also described local workers' complaints about working conditions:

> Of special note, during the factory tour on day two, and subsequently for the remainder of verification, [Customs] began receiving many unsolicited messages from the local workers. This was done by either discrete note passing like those pictured in Attachment 4 [to the Verification Report] or via text message to tell us about the local workers' mistreatment at the hands of the "Chinese" i.e., Kingtom's management and factory supervisors. By the end of verification [Customs] officials had been contacted by over 50 local employees who all claimed mistreatment. All of them expressed fear of speaking in front of the Kingtom officials for fear of retribution and as a result the local workers would only speak to certain members of the [Customs] team due to its ethnic makeup. This was evident to [Customs] officials when the group split into teams during the observation of the extrusion process; anytime a team member talked to a worker either in an official or unofficial capacity, such as stepping out of the factory to get fresh air, someone would come stand nearby and act as a minder. The person who acted as a minder was a Kingtom official and not a representative from Kingtom's counsel, fulfilling their responsibility to the client, from all appearances to us, it was solely to send a message of intimidation to the workers that were talking to the team.

Verification Report at 15. The workers also complained to the verifiers about low wages and

penalties that Kingtom imposed for various infractions such as listening to music at work or being

in the bathroom for too long. "[E]mployees were docked pay for missing work and any other

behavior that did not comply with Kingtom's rules." *Id.* at 18.

More directly in line with the purpose of the verification, the team also looked at Kingtom's

payroll records, wage payments, and the process of wage disbursement and found some

---

[17]    For five out of the ten work orders, TRLED found that more units were shipped and invoiced than produced. For four work orders, TRLED found that more units were produced than were shipped and invoiced, and as to the remaining one order, TRLED found that the units had been produced but not shipped due to the EAPA investigation. Verification Report at 7-10.

discrepancies between reported information and the verifiers' observation of wage disbursement. *See id.* at 16-18.

### D. TRLED's Affirmative Evasion Determination

On February 4, 2022, TRLED issued its Affirmative Evasion Determination, pursuant to 19 U.S.C. § 1517(c)(1), finding that "substantial evidence indicates that the Importer's [i.e., Kingtom's] imports were entered through evasion, resulting in the avoidance of applicable [antidumping and countervailing duty] cash deposits or other security" during the investigation period. *See* Affirmative Evasion Determination at 4.

In the Affirmative Evasion Determination, TRLED identified and discussed what it described as "discrepancies" observed in the record data. For example, TRLED found that while "[t]here is no question that Kingtom can produce aluminum extrusions; . . . there is no reliable evidence on the record that demonstrates it operates at the full capacity necessary to produce the amount of aluminum extrusions to the United States that it currently exports." *Id.* at 5.

Importantly, TRLED did not find any affirmative evidence that Kingtom was transshipping Chinese-origin aluminum extrusions to the United States. Rather, TRLED ultimately reached its determination that evasion had occurred by drawing the adverse inference that at least some of Kingtom's imports into the United States were Chinese-origin aluminum extrusions. *Id.* at 19.

While the verification findings regarding Kingtom's production capacity and capability could be generally said to support a finding of non-evasion, when making its determination, TRLED focused on discrepancies that it found existed in the records of the two *prior* investigations involving Kingtom.[18] Affirmative Evasion Determination at 7. As noted, TRLED had placed these

---

[18]        For example, TRLED found that "there is no evidence to prove what was actually supplied by [certain] Chinese suppliers during EAPA 7348/7423" because Kingtom did not

records on the record of this investigation. In other words, TRLED used information from prior investigations, that was placed on the record by TRLED, to cast doubt on the reliability of Kingtom's reported information which had been verified. The information from the prior investigations was not the subject of verification.

TRLED also observed that, during the period of investigation, Kingtom made "bulk payments" to certain suppliers that prevented TRLED from distinguishing what portion of the payments covered which purchased item, e.g., raw materials or packing supplies. *Id.* at 9. TRLED found that, given these "discrepancies," and Kingtom's ties to China,[19] it could not "confirm what Kingtom purchases from China." *Id.* at 9-10. While TRLED made this finding, it in no way suggested that any purchases were of aluminum extrusions.

TRLED also found reason to apply adverse inferences. It based its use of adverse inferences on its finding that Kingtom "failed to act to the best of its ability in this EAPA investigation by [its] failure to cooperate with [Customs] at verification." Affirmative Evasion Determination at 19.

---

provide a complete list of its Chinese suppliers, and its records identified what was purchased from those suppliers only in general terms such as "equipment" and "package material." Affirmative Evasion Determination at 7.

[19]      TRLED stated:

> [E]vidence on this administrative record shows that Kingtom is a company owned by Chinese nationals, located in the Dominican Republic, run by Chinese workers, using Chinese supplies, Chinese equipment, and Chinese raw materials, which allows for potential transshipment or commingling of Chinese aluminum extrusions. Therefore, for the aforementioned reasons, [Customs] finds that Kingtom has definitive ties to China, and moreover, [Customs] is not able to confirm what Kingtom purchases from China, because of the conflicting information provided by Kingtom in the three investigations.

Affirmative Evasion Determination at 9-10.

In the Affirmative Evasion Determination, TRLED stated, by way of explanation, why it found

Kingtom uncooperative at verification:

> Most importantly, at verification, Kingtom engaged in a campaign of intimidation to prevent Kingtom factory employees from speaking to U.S. Government officials during verification. Evidence on the record shows that Kingtom officials used minders whose apparent purpose was to intimidate workers into silence while talking to U.S. Government officials during verification. Such intimidation tactics were observed by all the members of the [Customs] team, many of whom were later approached by Kingtom's workers, and confirmed by the statements of the local workers to [Customs] officials at the end of verification. Specifically, eight local workers approached [Customs] officials and stated that they were instructed by their supervisors not to speak to [Customs] officials or risk retaliation. Evidence on the record supports this threat was real, and indeed carried out, as during verification [Customs] found out that these workers were terminated from employment for speaking to [Customs] officials. [Customs] officials observed an armed guard from the factory gate being escorted by a Chinese group leader back to the section of the factory where the eight terminated workers were from. Such observations and interactions cannot be ignored or dismissed given the serious nature of them. Furthermore, such tactics impeded [Customs]'s ability to conduct a proper investigation as it prevented [Customs] from getting a true and accurate picture of the inner workings of a company from primary sources, *e.g.*, the local factory workers. Also, these tactics are a way of withholding information from [Customs] in the attempt to get a favorable outcome.

*Id.* at 18-19. TRLED further found that

> *Kingtom failed to act to the best of its ability in this EAPA investigation by Kingtom's failure to cooperate with [Customs] at verification as described in detail in the above paragraph* [i.e., the paragraph quoted immediately above in this opinion]. Due to Kingtom's failure to cooperate during the verification, [Customs] was not able to verify or confirm whether the extrusions were produced on site in the Dominican Republic or imported from China. As a result, [Customs] is applying adverse inferences in drawing conclusions from other information on the record. [Customs] is relying on information in the Allegation that suggests that extrusions are imported from China. Specifically, the import data provided by the Alleger in the Allegation shows Chinese aluminum extrusions are being imported into the Dominican Republic. Other evidence on the record obtained from Kingtom, shows that Kingtom imports various raw materials and supplies from companies based in China, but [Customs] was unable to determine what actually is being imported because of Kingtom's failure to provide a consistent list of suppliers and a list of imported items. Further, Kingtom only provided evidence of bulk payments to Chinese companies, and [Customs] was unable either to trace these payments in bank statements provided by Kingtom or when reviewing Kingtom's records at

verification. *Based on all this information [Customs] infers that the aluminum extrusions that Kingtom imports into the United States are of Chinese origin.*

*Id.* at 19 (emphasis added). Next, TRLED stated:

> [Customs] finds that there is substantial evidence on the record that Kingtom did not produce all of the aluminum extrusions it imported [into the United States]: 1) Kingtom failed to provide accurate information overall, 2) Kingtom failed on numerous occasions to provide source documents substantiating its [Request For Information] submissions to [Customs] officials at verification, 3) Kingtom deliberately destroyed records prior to January 2020, which were relevant to this proceeding and past EAPA investigations; and 4) Kingtom company officials obstructed verification by conducting a campaign of worker intimidation. Overall, Kingtom's actions have prevented [Customs] from attaining a full and complete understanding of Kingtom's operations in the Dominican Republic. *As a result, [Customs] continues to find that Kingtom transshipped aluminum extrusions that were produced in China and transshipped to the United States through the Dominican Republic.*

*Id.* at 19-20 (emphasis added).

Thus, TRLED's primary finding was that by intimidating its workers during verification, Kingtom withheld information, and thus "fail[ed] to cooperate by not acting to the best of [its] ability to comply with a request for information" from the verifiers. *See* 19 U.S.C. § 1517(c)(3)(A). Because of this claimed failure to cooperate, and the discrepancies it identified on the record, e.g., regarding certain of Kingtom's suppliers, TRLED "in selecting from among the facts otherwise available" drew an adverse inference as to the ultimate facts that "the aluminum extrusions that Kingtom imports into the United States are of Chinese origin" and "that Kingtom transshipped aluminum extrusions that were produced in China and transshipped to the United States through the Dominican Republic." Affirmative Evasion Determination at 19-20.

## II.    R&R's Negative Evasion Determination on Administrative Appeal

On March 21, 2022, Kingtom asked for an administrative review of the determination, pursuant to 19 U.S.C. § 1517(f).[20] *See* Letter from Morris, Manning & Martin, LLP to Customs (Mar. 21, 2022), PR 71, CR 87, ECF No. 21.

On June 29, 2022, R&R reversed TRLED's affirmative evasion determination, finding that substantial evidence did not support a finding of evasion as to Kingtom. *See* Negative Evasion Determination at 11. The two main grounds for the reversal were: (1) that Kingtom's conduct during the investigation did not warrant the use of adverse inferences; and (2) based on the information provided by Kingtom, and the on-site observations of Customs' verification team, substantial evidence did not support the conclusion that Kingtom committed evasion during the period of investigation. *See id.* at 8 ("This *de novo* review . . . relies on information and explanations provided by Kingtom that we view to be sufficiently credible and reliable, in combination with the on-site observations of [Customs'] verification team.").

With respect to its finding that the use of adverse inferences was not warranted, R&R stated, by way of explanation:

> The [Affirmative Evasion Determination] focuses greatly on certain observations made by [Customs] and incidents which occurred during the verification visit, including communications with former workers who were apparently terminated by Kingtom for speaking to [Customs] officials, and questions over employee wage distribution practices, as well as on other purported discrepancies within the record. We agree that the intimidation and otherwise questionable treatment of workers raises serious concerns. However, given the

---

[20]    Kingtom's request was submitted by email but was not received until April 1, 2022, due to a technical glitch. *See* Negative Evasion Determination at 1 n.2 ("Due to a spam filter placed on the EAPA-FAD inbox, wherein Kingtom's submission of a request for administrative review was blocked from receipt, the existence of the submission by Kingtom was not discovered until April 1, 2022, upon receipt of an e-mail sent directly to an [R&R] attorney, to inquire about the status of the submission. At that time, the filter issue was discovered and corrected."). Thus, the statutory sixty-day period to complete R&R's review commenced on April 1. *See* 19 U.S.C. § 1517(f)(2).

> absence of evidence that the presence of the workers on-site was in any way
> fictitious, and the absence of any assertion that pertinent information was withheld
> or falsified by the workers, we do not find that those observations and incidents rise
> to the level of undermining the facts relevant to the question presented in this case:
> whether evasion of [antidumping/countervailing] duties occurred. Nor do we find
> that other purported discrepancies noted in the [Affirmative Evasion
> Determination], to the extent they might exist, have sufficient bearing on Kingtom's
> production capability and actual production, which are the determinative factors in
> this case, to overcome the substantial evidence demonstrating actual and significant
> production in the Dominican Republic.
>
> Therefore, based upon the documentation and information provided in the
> administrative record in EAPA Case No. 7550, there is not substantial evidence to
> support a finding of evasion as to Kingtom.

Negative Evasion Determination at 11.

Put another way, for R&R, Kingtom's verified information constituted substantial evidence

of non-evasion:

> 1) actual production was observed, 2) the presence of claimed machinery was
> verified, 3) the ability of the equipment to manufacture the products exported to the
> United States was verified, 4) monthly production reports were provided, and 5) the
> differences between production versus sales/export figures have been explained.

*Id.* at 9. That is, "substantial evidence demonstrat[ed] that Kingtom produced aluminum extrusions

in the Dominican Republic during the period of investigation in sufficient quantities to support the

non-subject imports claimed to be imported into the United States." *Id.* Thus, R&R made a

negative evasion determination.

Plaintiff timely commenced this action to contest R&R's Negative Evasion Determination.

*See* Compl. ¶ 1 ("Plaintiff brings this Complaint to contest portions of the final administrative

determination issued by the [R&R] in the *de novo* administrative review, pursuant to 19 U.S.C.

§ 1517(f), of the initial determination of evasion made by [TRLED], pursuant to 19 U.S.C.

§ 1517(c), in the Enforce and Protect Act . . . investigation into Kingtom Aluminio S.R.L. . . . ,

EAPA Case Number 7550.").

## STANDARD OF REVIEW

This Court "shall examine . . . whether the Commissioner fully complied with all procedures under subsections (c) and (f)" and "whether any determination, finding, or conclusion is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 19 U.S.C. § 1517(g)(2). "While the agency bases its [subsection (c) and subsection (f)] determination[s] . . . on substantial evidence and the court reviews the agency's actions to assess whether they are arbitrary and capricious, 'both standards require an assessment based on a reasonableness standard.'" *CEK Grp. LLC*, 47 CIT at __, 633 F. Supp. 3d at 1373 (quoting *Ad Hoc Shrimp Trade Enf't Comm. v. United States*, 47 CIT __, __, 632 F. Supp. 3d 1369, 1374 (2023)).

## DISCUSSION

Plaintiff challenges R&R's Negative Evasion Determination. Although what follows is primarily a discussion of that determination, the court's review necessarily took into account the TRLED's determination. *Ad Hoc Shrimp Trade Enf't Comm.*, 47 CIT at __, 632 F. Supp. 3d at 1374. Thus, what follows is a review of the TRLED's Affirmative Evasion Determination and R&R's Negative Evasion Determination.

## I.    The Parties' Arguments

Plaintiff challenges R&R's Negative Evasion Determination on three main grounds.

First, Plaintiff contests R&R's decision not to use adverse inferences against Kingtom. Specifically, Plaintiff argues that R&R "failed to adequately consider" record evidence that TRLED found justified the use adverse inferences—in particular, Kingtom's conduct toward its employees during verification. Pl.'s Br. at 14-15. For Plaintiff, "TRLED properly applied adverse

inferences" because "Kingtom prevented its employees from speaking with [Customs] officials at verification," including by using threats of violence against factory workers. *See* Pl.'s Br. at 14, 16 ("If there was nothing to hide, there would be no need to resort to threats of physical violence to hinder the verification.").

In addition to Kingtom's treatment of its workers, for Plaintiff, adverse inferences were warranted because "TRLED was unable to verify information critical to evaluating whether Kingtom produced the claimed aluminum extrusions because Kingtom did not have the necessary records, and . . . even deleted certain records." *Id.* at 14. Thus, Plaintiff argues, Kingtom did not cooperate to the best of its ability with TRLED's requests for information at verification, and the use of adverse inferences was justified.

Next, Plaintiff maintains that "TRLED properly relied on Kingtom's ties to China to find evasion," and that R&R failed to "acknowledge that TRLED relied on the record evidence of Kingtom's ties to China as part of [TRLED's] application of adverse inferences." Pl.'s Br. at 21; *see also* Affirmative Evasion Determination at 9-10. Plaintiff argues that R&R also failed to adequately address "widespread discrepancies involving issues directly relevant to evaluating Kingtom's production capability and actual production." Pl.'s Br. at 21.

Finally, Plaintiff also contends that R&R acted arbitrarily by arriving at a different conclusion here, in EAPA Case Number 7550, than was reached in the two prior investigations involving Kingtom, EAPA Case Nos. 7348 and 7423.[21] Plaintiff argues:

> [R&R's] conclusion that the record does not provide substantial evidence of
> evasion is also arbitrary, capricious, and an abuse of discretion because the agency
> previously relied on similar, and overlapping, evidence to find evasion. The agency
> did not provide sufficient justification for treating the similar situations differently.

---

[21]    As will be seen, R&R ultimately reversed its affirmative evasion determinations in both EAPA Case No. 7348 and No. 7423, concluding that in neither case did the record contain substantial evidence of evasion.

> Specifically, the agency relied on the same types of discrepancies in production records and ties to China to find that imports of aluminum extrusions from Kingtom include transshipped or commingled Chinese aluminum extrusions in two prior investigations involving Kingtom.

Pl.'s Br. at 33; *see also id.* at 33-36. Thus, Plaintiff urges the court to remand this matter to R&R "for reconsideration." *Id.* at 36.

For its part, Defendant maintains that R&R's decision not to apply adverse inferences was lawful and reasonable under the facts of this case. Defendant points out that the statute does not require the use of adverse inferences under any circumstances, but rather, by its permissive language ("may") leaves it to Customs to decide whether to use adverse inferences when a party fails to comply with a request for information. For Defendant, R&R reasonably concluded "that adverse inferences were not warranted here" because Kingtom cooperated with Customs' requests for information: "Kingtom provided a significant amount of documentation regarding its production and business practices and hosted a verification visit by [Customs] officials." Def.'s Resp. at 7.

As to Plaintiff's argument that verification was obstructed by Kingtom's intimidation and threats against factory workers if they cooperated with Customs, Defendant points out that R&R found that the administrative record "does not contain any instances where Kingtom refused to provide requested information to [Customs] that Kington would otherwise have access to but did not provide." *Id.* at 7-8. Thus, R&R found that Kingtom was not uncooperative, but "active[ly] participat[ed] throughout the investigation and [demonstrated] a willingness to provide additional information voluntarily." *Id.* at 8.

Defendant further maintains that R&R reasonably concluded that the record did not contain substantial evidence of evasion. After considering verified record evidence on Kingtom's production capacity and actual production during the period of investigation, R&R found that "the

record documentation demonstrated that Kingtom could produce the dimensions and quantities of

aluminum extrusions that it imported into the United States." Def.'s Resp. at 10.

Moreover, Defendant notes that, contrary to Plaintiff's claim, R&R addressed Kingtom's

incomplete sourcing information and its ties to China, when finding that the evidence on the record

did not support a finding of evasion:

> [TRLED's Affirmative Evasion Determination] lists sourcing information provided
> by Kingtom in two prior EAPA investigations, which information was placed on
> the record in this investigation due to the overlapping [periods of investigation].
> We do not opine on the question of whether such incorporation was appropriate.
> However, we note that the sourcing information does not provide evidence of
> evasion. Rather, it demonstrates that Kingtom sourced materials and equipment
> from many countries, China among them. However, and most notably, the
> items sourced from China were manufacturing equipment and materials,
> including some obviously non-subject materials, such as color powder.
> Therefore, if anything, the sourcing information supports Kingtom's position and
> does not provide evidence of evasion. The [Affirmative Evasion Determination]
> also points out that, in the [period of investigation] for this case, there is evidence
> of Kingtom's sourcing of raw materials from China. But raw materials are not
> covered by the [antidumping/countervailing duty] Orders. Thus, this evidence
> cannot be used to support a finding of evasion.
>
> Indeed, there is no dispute that Kingtom has connections to China.
> However, the fact that Kingtom admittedly employs Chinese workers, has Chinese
> ownership, and sources equipment and certain materials from China is not
> evidence of evasion. This is especially so in the face of documented and observed
> significant manufacturing of aluminum extrusions, during the period of
> investigation in this case, by Kingtom, in the Dominican Republic.

Negative Evasion Determination at 10-11. In other words, for R&R, the information on the record

showing that Kingtom sourced some materials from China did not constitute evidence of evasion.

Rather, the record evidence, on balance, supported a finding of non-evasion.

R&R also found that its negative evasion finding was further supported by "the total lack

of any record evidence of any imports by Kingtom into the Dominican Republic, during the

relevant period of investigation, of aluminum extrusions manufactured in China." *Id.* at 10 & n.27

(observing that the Allegation "only provided overall import data of aluminum extrusions from

other countries, including China, into the Dominican Republic. It does not show Kingtom as the importer of such goods into the Dominican Republic," and that "Kingtom also stated in the [Request For Information] Response that it did not import any aluminum extrusions from China into the Dominican Republic"). Further, R&R noted that "the record does not show that Kingtom sourced any aluminum ingots or scrap, the main raw materials from which aluminum extrusions are created, from China." *Id.* at 10.

Finally, as to the argument that R&R's finding here is arbitrary because it previously found evasion in the two prior investigations involving Kingtom, Defendant points out that the original affirmative evasion findings were subsequently reversed by Customs:

> [I]n all three EAPA actions concerning aluminum extrusions imported and/or exported by Kingtom, [Customs] now maintains a consistent position: that there is not substantial evidence of evasion on the record. Although [Plaintiff] may disagree with the end results in these EAPA actions, the consistent and reasoned decisions by [R&R] after either a *de novo* administrative review or a court-ordered remand are squarely within the agency's purview to render.

Def.'s Resp. at 16.[22] Thus, Defendant asks the court to sustain R&R's Negative Evasion Determination.

---

[22]     Even had it been the case that the final determination in each investigation found no evasion, Plaintiff's argument with respect to arbitrariness would not be persuasive. The court agrees with the TRLED's observation that "while [Customs] found affirmative determinations of evasion for both EAPA 7348 and 7423, the previous determinations do not mean that [Customs] will automatically find evasion in a subsequent or related proceeding. Rather, *each EAPA investigation is separate, and each administrative record must stand on its own*." Affirmative Evasion Determination at 6 n.44 (emphasis added).

## II.    The Court Sustains the Negative Evasion Determination

The court finds no error with respect to either R&R's decision not to use an adverse inference against Kingtom, or its finding that substantial evidence did not support a finding of evasion. Indeed, as will be seen, substantial evidence on the record here demonstrates non-evasion.

R&R did not err when it found that adverse inferences were not warranted. It is worth repeating the statutory standard that must be met for the use of an adverse inference to be lawful:

> If the Commissioner finds that a party or person . . . has failed to cooperate by not acting to the best of the party or person's ability *to comply with a request for information*, the Commissioner may, in making a[n evasion] determination under [19 U.S.C. § 1517(c)(1)], use an inference that is adverse to the interests of that party or person in selecting from among the facts otherwise available to make the determination.

19 U.S.C. § 1517(c)(3)(A) (emphasis added). Plaintiff does not identify any instance where Kingtom failed to comply with a request for information either during the information-gathering stage, or at the on-site verification. Instead, the record shows that Kingtom timely responded to all Requests For Information and voluntarily supplied additional information. Additionally, during the in-person verification, Kingtom made its staff available to review with TRLED verifiers ten work orders and other business records including production, sales, accounting, and payroll records. Kingtom also provided factory tours, which allowed TRLED to verify the company's production capability and capacity. *See Leco Supply, Inc. v. United States*, 47 CIT __, __, 619 F. Supp. 3d 1287, 1299 (2023) ("Interested parties, including both foreign producers and importers, bear the burden to provide sufficient evidence of production capabilities.").

Notwithstanding the claimed intimidation of factory workers, TRLED verifiers spoke with as many as fifty local employees. *See* Verification Report at 15 ("By the end of verification [Customs] officials had been contacted by over 50 local employees who all claimed mistreatment. All of them expressed fear of speaking in front of the Kingtom officials for fear of retribution and

*as a result the local workers would only speak to certain members of the [Customs] team* due to

its ethnic makeup.[23]" (emphasis added)). While the worker complaints are disturbing, none of the

workers provided evidence that Kingtom could not or did not produce aluminum extrusions in

sufficient quantities to equal imports into the United States. Nor did they provide any evidence of

transshipment. In addition, these complaints did not go to the question that must be answered in

the affirmative for adverse inferences to be used, i.e., did a party or person fail to cooperate "by

not acting to the best of the party or person's ability to comply with a request for information"? 19

U.S.C. § 1517(c)(3)(A). Indeed, Plaintiff has identified nothing in the record showing that the

intimidation tactics prevented Customs from receiving the information it asked for.

Plaintiff suggests that Kingtom's deletion of records from prior investigations, that had

been placed on the record here, hindered verification and demonstrated the company's failure to

do its best to comply with TRLED's requests for information in this investigation. There is nothing

indicating, however, that the scope of verification in this case was broadened to cover documents

from prior periods of investigation. *See* Verification Report at 2 (stating that the "parameters of

the EAPA investigation [at issue] covered entries filed by Kingtom from January 8, 2020 through

the pendency of the investigation"). Thus, the deletion of the records, without more, could not be

said to support the argument that Kingtom "failed to comply with a request for information."

Moreover, this case is distinguishable from recent cases like *Aspects Furniture*

*International, Inc. v. United States*, where this Court sustained the application of an adverse

inference where documents were deleted after Customs had asked for them. 47 CIT __, __, 651 F.

Supp. 3d 1328, 1340 (2023). In *Aspects*, Customs found that the importer "failed to cooperate to

---

23    According to the Verification Report, Kingtom's local workforce is comprised of
teams of Haitian and Dominican workers and their Chinese supervisors. *See* Verification Report
at 15 n.7.

the best of its ability with respect to Customs' request for information during the on-site verification because on two occasions [the importer's] employees were observed deleting dozens of files *in response to inquiries from Customs' verifiers* about what merchandise was shipped and by which manufacturer." *Id.* (emphasis added). Here, unlike in *Aspects*, there is no claim that Kingtom deleted records in response to inquiries from Customs. Rather, Kingtom maintained and produced, on request, information relevant to the period of investigation.

Also, to the extent the prior investigations' periods of investigation and the instant period of investigation overlap, i.e., for an eleven-month period, from January to November 2020, there is no claim that Kingtom deleted information from that overlap period. *See* Affirmative Evasion Determination at 6. Indeed, there is no evidence that information was withheld in response to Customs' inquiries. As R&R stated: "[G]iven . . . the absence of any assertion that pertinent information was withheld or falsified by the workers, we do not find that those observations and incidents rise to the level of undermining the facts relevant to the question presented in this case: whether evasion of [antidumping/countervailing] duties occurred." Negative Evasion Determination at 11.

Thus, notwithstanding Kingtom's alleged worker intimidation and failure to retain pre-period of investigation records, there is nothing to indicate that Customs did not obtain the information it asked for during verification, or indeed at any point during the investigation. Thus, R&R reasonably found that the use of an adverse inference was not warranted.

As to Plaintiff's claim that R&R failed to "acknowledge that TRLED relied on the record evidence of Kingtom's ties to China," this is simply not the case. *See* Pl.'s Br. at 21. R&R expressly found that "there is no dispute that Kingtom has connections to China." Negative Evasion

Determination at 11. R&R disagreed with Plaintiff, however, that these connections were material to the issue of evasion.[24]

Similarly, there cannot be any serious dispute that R&R grappled with data discrepancies that are relevant to Kingtom's production capability and actual production, which R&R found were "the determinative factors in this case." Negative Evasion Determination at 11. Plaintiff claims that R&R ignored discrepancies in data concerning "production, sales, employee attendance and payroll, raw material purchases/suppliers, and financial records." Pl.'s Br. at 21-22.

R&R may not have addressed all of the data points that Plaintiff has identified in its brief, but it did address perceived discrepancies in the data that mattered most to its evasion determination, i.e., Kingtom's production data. In the Negative Evasion Determination, R&R stated that "[d]ifferences between production and sales/export figures are expected." Negative Evasion Determination at 9. R&R went on to observe: "Kingtom provided the maximum production capacity for each aluminum extrusion press in response to the [Requests For Information], and the numbers reflected as the total maximum capacity were only exceeded by one aluminum extrusion press in two of the reviewed months." *Id.* 9-10. Finding this discrepancy in the production data was not "fatal," R&R discussed Kingtom's explanation for the discrepancies, i.e.:

> In actual production, the production capacity of each machines (*sic*) also depends on the technician's skill in addition to the size and thickness of the extrusions. If

---

[24]    As R&R went on to find:

> [T]he fact that Kingtom admittedly employs Chinese workers, has Chinese ownership, and sources equipment and certain materials from China is not evidence of evasion. This is especially so in the face of documented and observed significant manufacturing of aluminum extrusions, during the period of investigation in this case, by Kingtom, in the Dominican Republic.

Negative Evasion Determination at 11.

the technician's skill is good, the production output can be higher. If the size and thickness of extrusion is beyond the normal size and thickness, the output will be more than theoretical output. If the size and thickness of extrusion is smaller than the normal size and thickness, the output will be less than theoretical output.

*Id.* at 10 (quoting Kingtom's RFI Response Exhibit 27). This explanation, together with other evidence on the record, convinced R&R that the record, as a whole, did not contain substantial evidence of evasion:

The production data measures output in kilograms. Therefore, Kingtom's explanation regarding possible differences in production amounts helps to counter the perceived anomaly of those two months in comparison to the rest of the aluminum extrusion presses, which did not exceed the given maximum production capabilities in any of the months reviewed during the verification visit. Given these explanations provided by Kingtom and the weight of the evidence as a whole showing that Kingtom produced aluminum extrusions in the quantities that it sold and exported to the United States, the small anomalies discussed above do not rise to a level of substantial evidence that evasion has occurred.

*Id.* In other words, R&R acknowledged discrepancies in production data, but found that, when considered in the context of other record evidence showing that "Kingtom produced aluminum extrusions in the quantities that it sold and exported to the United States," the "small anomalies" in the production capacity data did not equal substantial evidence of evasion. The court does not find R&R unreasonably focused its analysis on data discrepancies relevant to production instead of employment, wage, and other data which has less direct bearing on the question of whether substantial evidence of evasion exists on the record.

Indeed, R&R reasonably found that the record did not contain substantial evidence of evasion. As noted, evasion is the entering of goods into U.S. customs territory "by means of any document or electronically transmitted data or information, written or oral statement, or act that is material and false, or any omission that is material," and that results in the reduction or avoidance of payment of applicable antidumping or countervailing duties. 19 U.S.C. § 1517(a)(5)(A). Here, Plaintiff alleged that Kingtom had committed evasion, as defined: "Kingtom has imported Chinese

aluminum extrusions subject to the Orders that Kingtom transshipped through the Dominican Republic, resulting in evasion within the meaning of the EAPA statute." Allegation at 6.

Upon investigation of the evasion claim, and verification of the record information for the period of investigation, TRLED did not find any affirmative evidence that Kingtom imported finished Chinese-origin aluminum extrusions into the Dominican Republic, for re-export to the United States. Instead, it appears that R&R reasonably found substantial record evidence of non-evasion.

As to importation of finished product, the undisputed record evidence demonstrates that Kingtom has one factory, which is located in a free trade zone in the Dominican Republic.[25] And that free trade zone is monitored by the Dominican government. Correspondence on the record, between Kingtom and an analyst of the National Council of Export Free Zones, shows that finished products are not permitted to enter the free trade zone.[26] As verified by TRLED:

> [A Kingtom official] explained that their imports and exports of merchandise are monitored by the DR Customs, who are located within their facility. Due to being located in a free trade zone, [the official] stated that the DR Customs examines every truck and container arriving into Kingtom's facility. [The official] further stated that the DR government prohibits the importation of finished merchandise due to Kingtom being located in a free trade zone.

---

[25]    It is apparent from the Negative Evasion Determination that R&R considered Kingtom's argument that, by virtue of its location in a free trade zone, importation of finished Chinese aluminum extrusions was prohibited, but R&R did not make a finding regarding this argument.

[26]    The analyst stated:

Kingtom, as a free trade zone importer, may import [into the Dominican Republic] only inputs, raw materials, machinery, and equipment for their production and . . . Kingtom is also prohibited from importing any finished aluminum extrusions into the zone. It may only do so when accepting returns and requires as proof shipping documentation that guarantees [the] export.

Kingtom's Rebuttal Factual Information to Customs' Mem. Adding Certain Docs. to the Admin. R. (Aug. 23, 2021) at 2 & Ex. 95, PR 83, CR 70, ECF No. 21.

Verification Report at 3. At oral argument, counsel for Plaintiff conceded that there was no affirmative evidence on the record demonstrating that Kingtom imported finished aluminum extrusions from China into the Dominican Republic, yet insisted that the record evidence did not conclusively demonstrate that it was "impossible" for Kingtom to do so. *See* Audio: Oral Arg. in Court No. 22-00236 (Mar. 4, 2024) at 00:49-51:38 (on file with author). Plaintiff points to no evidence, though, that Kingtom imported finished merchandise in violation of free trade zone rules that prohibit the importation of finished merchandise. Thus, Plaintiff's claim that Kingtom imported finished aluminum extrusions from China amounts to speculation. And "'[m]ere speculation' is not substantial evidence." *OSI Pharms., LLC v. Apotex Inc.*, 939 F.3d 1375, 1382 (Fed. Cir. 2019) (quoting *Intell. Ventures I LLC v. Motorola Mobility LLC*, 870 F.3d 1320, 1331 (Fed. Cir. 2017)).

     With respect to production capability and actual production, the record evidence supports the finding that Kingtom could, and did, produce sufficient aluminum extrusions to meet the demands of its customers in the United States. Indeed, R&R reasonably found that "purported discrepancies noted in the [Affirmative Evasion Determination[27]], to the extent they might exist, [do not] have sufficient bearing on Kingtom's production capability and actual production, which

---

[27]     The TRLED inferred evasion based on purported discrepancies among the records of prior investigations and in the record of the underlying investigation here (EAPA Case Number 7550), e.g., concerning sourcing of material and equipment. As R&R noted, the sourcing information, however, merely "demonstrates that Kingtom sourced materials and equipment from many countries, China among them," and "most notably, the items sourced from China were manufacturing equipment and materials, including some obviously non-subject materials, such as color powder ." Negative Evasion Determination at 10-11 ("[T]he fact that Kingtom admittedly employs Chinese workers, has Chinese ownership, and sources equipment and certain materials from China is not evidence of evasion. This is especially so in the face of documented and observed significant manufacturing of aluminum extrusions, during the period of investigation in this case, by Kingtom, in the Dominican Republic.").

are the determinative factors in this case, to overcome the substantial evidence demonstrating

actual and significant production in the Dominican Republic." Negative Evasion Determination

at 11. The "substantial evidence demonstrating actual and significant production in the Dominican

Republic" includes evidence of the quantity of aluminum extrusions produced by Kingtom per

month, as tracked by a software program at the factory, and the total export amounts reported by

Kingtom in its voluntary submission.[28] *See* Verification Report at 15. Apparently, TRLED

observed that Kingtom not only had the capability and capacity to produce aluminum extrusions,

but also that Kingtom's actual monthly production and exports abroad were sufficient to satisfy its

customers' orders during the period of investigation.

 Moreover, the court cannot ignore "the total lack of any record evidence of any imports by

Kingtom into the Dominican Republic, during the relevant period of investigation, of aluminum

extrusions manufactured in China," as R&R found. *See* Negative Evasion Determination at 10 &

n.27 (observing that the Allegation "only provided overall import data of aluminum extrusions

from other countries, including China, into the Dominican Republic. It does not show Kingtom as

---

[28] The Verification Report cites Direccion General de Aduanas zone export data from
January 2020 and July 2021 contained in Exhibit 93 of Kingtom's Second Voluntary Submission,
dated August 23, 2021, ECF No. 21, showing that Kingtom produced more than it exported
anywhere during the period of investigation. *See* Verification Report at 15.

| Month/Year | Actual Production Per computer Software (Kilograms) | Export Data Exhibit 93 | Absolute Difference |
|---|---|---|---|
| February 2020 | [[    ]] | [[    ]] | [[    ]] |
| March 2020 | [[    ]] | [[    ]] | [[    ]] |
| September 2020 | [[    ]] | [[    ]] | [[    ]] |
| November 2020 | [[    ]] | [[    ]] | [[    ]] |
| February 2021 | [[    ]] | [[    ]] | [[    ]] |
| March 2021 | [[    ]] | [[    ]] | [[    ]] |
| April 2021 | [[    ]] | [[    ]] | [[    ]] |

the importer of such goods into the Dominican Republic," and that "Kingtom also stated in the [Request For Information] Response that it did not import any aluminum extrusions from China into the Dominican Republic").

Finally, the court finds difficult to credit Plaintiff's claim that R&R's negative evasion determination here was arbitrary based on other investigations involving Kingtom, namely investigations of alleged evasion by Kingtom covering a roughly two-and-a-half-year period from October 9, 2018, to January 28, 2021. *See* Affirmative Evasion Determination at 6. It is worth repeating that, unlike in the prior investigations, the investigation under review here is the only one in which there was on-site verification. *See* Def.'s Resp. at 16 ("EAPA 7550 is the sole investigation to benefit from [Customs'] site verification of Kingtom's facilities."). Additionally, in both of the other investigations, while initially finding evasion, Customs ultimately reversed itself and made a negative evasion determination in both cases. *See* Results of Remand Redetermination in EAPA Consol. Case No. 7348 at 2, *Global Aluminum Distributor LLC v. United States*, Ct. No. 21-00198 (CIT June 15, 2022), ECF No. 93 ("R&R has reconsidered its original finding of substantial evidence of evasion and affirmance of [TRLED's] determination of evasion, . . . in EAPA Consolidated Case Number 7348," and reverses the evasion determination); Results of Remand Redetermination in EAPA Case No. 7423 at 2, *H&E Home, Inc. v. United States*, Ct. No. 21-00337 (CIT Jan. 10, 2023), ECF No. 73 ("[A]fter reevaluating the evidence on the record, [R&R] . . . is reversing its original determination and finds that there is no evasion."). Therefore, contrary to Plaintiff's claim, R&R's Negative Evasion Determination is consistent with the ultimate determinations in the prior cases.

Thus, the court finds that Customs has complied with all procedures under subsections (c) and (f), and the Negative Evasion Determination is not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

## CONCLUSION

Based on the foregoing, R&R's Negative Evasion Determination is sustained. Judgment shall be entered accordingly.

    /s/ Richard K. Eaton    
Judge

Dated:       June 13, 2024
              New York, New York